**Hoyle E. GREEN, Individually and as Guardian of Takuye Green, Incompetent, Plaintiffs,**

v.

**UNITED STATES of America, Defendant and Third Party Plaintiff,**

v.

**William SIGNORINI, Patricia McNabb-Kaminski, James Zischler, Dr. Derward Lepley, Dr. Robert Flemma, Cardiovascular Surgery Associates, S. C., and St. Paul Fire and Marine Insurance Co., Third Party Defendants.**

Civ. A. No. 80–C–854.

United States District Court, E. D. Wisconsin.

Jan. 21, 1982.

---

William M. Cannon, Milwaukee, Wis., for plaintiffs.

Barbara B. Berman, Melvin Washington, Asst. U. S. Attys., Milwaukee, Wis., for the U. S.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

This is a medical malpractice action brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.*, alleging that Dr. William Stanford, an Air Force surgeon, acting within the scope of his employment, was negligent in an operation performed on Takuye Green. A 12-day trial to the court on the claims between the plaintiffs and the government began October 6, 1981. The case was very well presented by William Cannon, counsel for the plaintiffs, and Assistant United States Attorneys Barbara Berman and Melvin Washington on behalf of the government. The following are my findings of fact and conclusions of law.

### Facts

#### THE OPERATION

On May 2, 1978, Takuye Green, then 54 years old, underwent coronary bypass surgery at Milwaukee Lutheran Hospital. During the connection of the heart-lung machine, the lines to and from the machine were reversed, resulting in oxygen-depleted blood being sent to Mrs. Green's brain. She suffered extensive, irreversible brain damage and has been a patient at the Veterans Administration Hospital at Wood, Wisconsin, under extensive nursing care, almost continuously since the operation.

The operation on May 2, 1978, was performed by Dr. Donald Mullen, who with two other Milwaukee doctors, Derward Lepley and Robert Flemma, works through a service corporation, Cardiovascular Surgery Associates, S. C. (CVSA). Dr. Stanford was a fellow with CVSA as a result of a permissive temporary duty (TDY) order from the Air Force, and on May 2 was acting as first assistant to Dr. Mullen during the operation on Mrs. Green.

Under the routine practice of CVSA, the initial work of preparing Mrs. Green for surgery was done by physician's assistants and a first assistant physician. Perfusionist James Zischler readied the heart-lung machine, in part by setting up the tubing which would connect the patient with the machine. He then handed the tubing to William Signorini, a physician's assistant, whose task was to straighten out the lines, place connectors on the two venous lines but not on the arterial line, and clamp the lines to the operating table with the arterial line closest to the patient's head.

At this point the first of a number of tragic errors was made. Signorini placed a connector on the arterial line and placed a venous line closest to Mrs. Green's head.

The next step was performed by the first assistant, Dr. William Stanford. It was Dr. Stanford's duty to open the chest and cannulate the patient.

Although no witness had ever encountered or heard of a case in which line reversal occurred, the physicians at CVSA were aware that because the lines used were all the same diameter, texture and color, precautions were necessary to be certain connections were properly made. Out of this concern, CVSA had ordered new, marked lines which were not yet available on May 2, 1978.

According to all trial witnesses acquainted with CVSA, except Dr. Stanford, CVSA had also instituted procedures to be used in making the actual connection of the lines with the patient, which had as a primary purpose, insuring that the lines were connected in the proper manner. The first procedure was to be performed when the arterial line from the machine was connected to the cannula which was in the patient's heart. The surgeon would ask the perfusionist to give a quarter turn from the pump. With the quarter turn, fluid would run through the tubing, signaling that the tube was in fact the proper one. The second procedure was to be performed after

the arterial line was connected. The surgeon would order that the patient's head be lowered and 200 cc's of fluid be infused into the patient to make sure that there was no obstruction in the flow, no air in the line, and that the line was properly attached.

Dr. Stanford did not perform these tests, and the lines incorrectly clamped to the operating table were improperly connected to Mrs. Green. Dr. Stanford claims that he was never told to use the procedures during all operations, that the procedures he used were acceptable for cannulating a patient, that the physicians at CVSA did not use the procedures in all operations, and that if they did, then Signorini, Zischler, and/or Patricia McNabb-Kaminski, another member of CVSA, were negligent in not insisting that he perform the tests. I find specifically that the two procedures were routine, were in large part to function as safety procedures to prevent line reversals, and that Dr. Stanford had been instructed to use the procedures.

After Mrs. Green was prepared for the operation Dr. Mullen entered the room and ordered that the heart-lung machine be turned on. At this point in an operation, when the blood first begins to flow through the lines, it is possible to observe which way the blood is running. Although an observation at this time was possible, no one was watching.

After the operation began, the monitor showed that Mrs. Green had low arterial pressure and unusually high venous pressure. These pressures were not entirely uncommon, but did cause some concern. The perfusionist was ordered to administer neo-synephrine and to increase the arterial flow from the machine. Those procedures were done but the pressures did not improve. In addition, the blood in the venous lines was a brighter red than would ordinarily be expected. The unusual indications persisted during the early part of the operation and, when uncorrected, caused increased concern. Dr. Mullen tried to readjust the superior vena cava line to lower the pressure. That did not work. When the conditions continued, at from 15–20 minutes into the operation, a thorough search was undertaken to discover what was wrong. The lines were traced back to the machine and the error discovered. The discovery came too late.

## WILFORD HALL

Dr. Stanford received his medical degree from the University of Iowa in 1956. He was board certified in general surgery in 1965, and in thoracic surgery in 1966. As an Air Force officer, he was Chief of the Cardiothoracic Surgery Service at Wilford Hall, Lackland Air Force Base, San Antonio, Texas, from 1969 to 1980. He was Chairman of the Department of Surgery at Wilford Hall from July, 1975 to September, 1977.

At least by mid-1976, a suspicion was spreading throughout Wilford Hall that Dr. Stanford's surgical skills were not what they should be. Members of the Cardiology Department were manipulating case presentations to prevent Dr. Stanford from performing surgery on their patients.

In early 1977, Dr. Carey Akins, a young cardiac surgeon in the Air Force under the Berry Plan [1], began quietly to gather statistics on mortality rates of Dr. Stanford's patients. Checking data from 1975 through 1977, he discovered that Dr. Stanford's death rate was over 40%, while that of the other surgeons was less than 10%. Unsatisfied with raw statistics, he consulted a medical treatise to obtain expected mortality rates for the kinds of operations Dr. Stanford was performing. When a range of expected mortalities was given, he used the higher rate. When he knew about a patient personally, he adjusted the expected mortality figure upward if appropriate, never downward, thus giving Dr. Stanford the benefit of the doubt. He found that a

1. The Berry Plan was a draft deferral system that permitted the postponement of military service while pursuing medical studies with an obligation to complete that service after the student acquired more training. The system was named for its formulator, Dr. George Parker Berry, Dean of the Harvard Medical School.

predicted mortality rate for the operations Dr. Stanford was performing was 12%; Dr. Stanford's actual rate was 43%.

Dr. Akins tried to confront Dr. Stanford with the data in April, 1977. Dr. Stanford would not listen. Dr. Akins decided to present the statistics to Dr. William Kemmerer, an Air Force officer at Randolph Air Force Base, also in San Antonio. Dr. Kemmerer, in turn, presented the statistics to General Paul Myers, a neurosurgeon who was the Chief of the Wilford Hall Medical Center from 1973 until 1978. General Myers is now Surgeon General of the Air Force. As far as Dr. Akins could tell, nothing happened as a result of his study.

In late May, 1977, two children were scheduled for difficult operations to be performed by Dr. Stanford. Dr. John Waller, another Berry Plan physician, an anesthesiologist, decided that as a matter of ethics, he would not provide anesthesia for the operations. His superior officer, Dr. Francis Dannemiller, supported Waller's decision.

As a result of Dr. Waller's refusal, a long meeting was held in Gen. Myer's office on May 26, 1977. Several people, including Dr. Stanford, were present. Finally, Dr. Waller conceded that if Gen. Myers issued a direct order to administer the anesthesia, he would have to consider obeying it. But if he obeyed, he would write a dissenting note on the patients' records. Gen. Myers became angry and left the room. However, word came back that the operations would be cancelled.

Two days later, Gen. Myers summoned Dr. Akins to his office and during the course of the meeting, Dr. Akins informed Gen. Myers as to how he had compiled his statistics. Dr. Akins suggested that an outside investigator be called in to study the problem. Dr. Akins was also called in to Dr. Stanford's office, at which time he informed Dr. Stanford that he found his surgical skills insufficient.

In response to these events, on June 1, 1977, Dr. Stanford presented his own statistical data to Gen. Myers. Gen. Myers found Dr. Stanford's statistics inaccurate and al-most meaningless. The statistics did, however, show a 40% mortality rate from January, 1975 to June, 1977.

By July 12, 1977, Gen. Myers apparently became convinced that he was confronted with a problem. He wrote to Dr. Paul A. Ebert, a pediatric cardiac surgeon, who for six years had been a national consultant to the Air Force. Gen. Myers told Dr. Ebert that an extraordinarily well-trained cardiac anesthesiologist had alleged that the open heart surgery program at Wilford Hall had a high mortality rate; that he had received two different sets of statistics, which left him "no closer to a solution"; and that cardiologists were reluctant to refer cases within the institution. In a classic understatement, General Myers continued, "You can well imagine that this has caused an undue amount of consternation." He went so far as to perceive that part of the problem had been resolved "with the departure of the cardiac anesthesiologist." With his back to the wall and action of some kind being necessary, Myers requested that Dr. Ebert review the Open Heart Program at Wilford Hall.

On September 9, 1977, yet another study was presented to General Myers by Dr. Charles Beckmann, Chief of Cardiology. This was a study done by Drs. Robert D. Slama and Charles A. Boucher on the graph patency and mortality rates for all cardiac surgeons. Again, Dr. Stanford's mortality rate was highest, 43% for operations performed from September 1, 1975, to September 1, 1977. In addition, his patency rate was the worst of all the surgeons.

On September 13, 1977, Dr. Homer Woosley, Vice Commander at Wilford Hall, drafted a document setting forth options available to Gen. Myers for handling the Stanford problem. Option 1 was to leave it alone. Dr. Woosley urged rejection of this solution because the problem had already surfaced. Option 2 was to credential Stanford, i.e. to officially limit or restrict his surgical privileges. Option 2 was seen as a last resort. Option 3 was to give Dr. Ebert all the data and to seek his recommendation. Option 4 was to confront Dr. Stan-

ford with the fact that "his results are consistently bad" and state that if he did not voluntarily agree to limit his activities as a surgeon, he would be given research responsibilities or a year's fellowship somewhere to correct his deficiencies.

Dr. Ebert visited Wilford Hall from September 19 through September 21, 1977, and submitted his report on September 28, 1977. He was given only limited information with which to work and claimed in a trial deposition, that he was not in a position to decide the issue of the competence of Dr. Stanford. However, his report states: "The question of one surgeon, Col. William Stanford, having considerably worse operative results than other surgeons cannot be dismissed." He went on to indicate that Dr. Stanford had operated on "high risk" patients, "one in which the operative results would be of doubt in any center . . ." He recommended that high risk patients not be operated on, and that other patients be "randomized" among the surgeons in an attempt "to define whether or not the question of competence of Col. Stanford and the staff are comparable."

The experiment was not carried out, however. It was unacceptable to the cardiologists. Rather, Dr. Stanford received a permissive TDY (temporary duty) order, allowing him to accept the fellowship he had sought and secured with CVSA in Milwaukee.

Dr. Stanford obtained the fellowship by requesting it from Dr. Flemma, whom he had known when Flemma was in Texas at an Army hospital. In applying for the fellowship he told Dr. Flemma that he was spending a lot of his time in administration and was not doing as much surgery as he would like. He claimed to want the fellowship to be brought up to date on surgical procedures. Dr. Flemma never investigated Dr. Stanford's background because the story was plausible, Dr. Stanford, after all, being the Chief of Surgery at a major Air Force hospital.

The physicians at CVSA were not warned that Dr. Stanford was, in a word used by Drs. Akins, Waller, and Daniel Knauf,

"rough." CVSA was not told that Dr. Stanford was, in the words of Dr. Knauf, who testified for the government, inconsistent, sometimes careless, and difficult to sway from his own notion of how an operation should be carried out. Gen. Myers, who was seriously concerned about the allegations against Dr. Stanford at Wilford Hall, signed the permissive TDY orders and sent Stanford to CVSA without comment. Although Dr. Stanford was sent to Milwaukee without comment, his activities at Wilford Hall following the fellowship were significantly restricted. Upon his return he resumed the title of Chief of the Cardiothoracic Surgery Service but Dr. Knauf scheduled all operations. In addition, Dr. Stanford was not allowed to perform surgical procedures unless Dr. Knauf was present to supervise.

### The Claims

Plaintiffs claim that Dr. Stanford did not possess the reasonable degree of skill, experience, or judgment of other members of his specialty, that he did not apply his skill with reasonable care, and that he did not exercise his best judgment. They also claim that under the requirements for informed consent, Dr. Stanford should have informed either CVSA or the Greens of his mortality rates. Plaintiffs argue that Dr. Stanford and William Signorini were causally negligent and that Dr. Mullen was not causally negligent or was at the very most only minimally responsible for what happened.

The government argues that under the borrowed servant doctrine, it is not liable for Dr. Stanford's negligence. Furthermore, defendant argues, under the FTCA, the court lacks jurisdiction on the issue of informed consent pleaded in the amended complaint, or alternatively, that if the failure to disclose the Texas information constitutes misrepresentation, the claim is barred by 28 U.S.C. 2680(h). Defendant also claims that the Texas events are irrelevant to a determination of negligence and that Dr. Stanford was under no duty to inform CVSA or Mrs. Green of his mortality rates.

On the apportionment of negligence, defendant argues that Dr. Stanford was not causally negligent. It argues that Dr. Mullen, who was primarily responsible for the surgery, was primarily responsible for the injury to Mrs. Green. Furthermore, any errors made by Signorini or Stanford are seen by the government as correctable by Mullen, who is also seen to be negligent for failing to stop the operation to find the problem. In addition, the government argues that Dr. Mullen was negligent for failing to watch the direction of flow in the lines when the machine was turned on; that William Signorini was negligent in improperly placing the connectors on the lines and the lines on the table; and that others in the operating room, particularly Zischler, Signorini and Patricia McNabb-Kaminski, were negligent for failing to insist that Dr. Stanford perform the safety procedures.

Dr. Stanford and the government have presented an array of claims and excuses for the problems at Wilford Hall and the events during the operation on Takuye Green. The incompatible positions undermine both Dr. Stanford's credibility and the defense here. Dr. Stanford claims that his mortality rates were high because he was operating on high risk patients. If that were true to a significant degree, the cardiologists at Wilford Hall, those most familiar with the patients on whom he operated, would have recognized that high risk surgery accounted for his results. His claim that he was doing high risk surgery is also incompatible with his statement to Dr. Flemma that he had been doing primarily administrative work, had been away from surgery, and needed to brush up on new techniques.

Dr. Stanford claims that he is not causally negligent, even though he admits that he was not watching the directional flow of the fluid as the heart-lung machine was turned on. However, he claims that because they were not watching, Dr. Mullen and McNabb-Kaminski were causally negligent. Dr. Stanford claims that he was not causally negligent because of his failure to perform the safety procedures, but Zischler and Signorini were negligent for not insisting that he perform them. In short, he points the finger at everyone else when, instead, he should be looking in the mirror.

### The Borrowed Servant Doctrine

By order filed September 21, 1981, I ruled that the Medical Malpractice Immunity Act, 10 U.S.C. § 1089, and the Federal Tort Claims Act must be read *in pari materia*, i.e. that "acting within the scope of his office or employment," means the same thing in both acts. I found that policy reasons prevent the government from obtaining dismissal of a defendant because he was acting within the scope of his employment, and then later, after the statute of limitations had run, obtain summary judgment because although he was acting within the scope of his employment for purposes of immunity, he was not covered by the FTCA, because he was a borrowed servant of another employer. I adhere to that view.

Nevertheless, at trial, the government was allowed to establish its record with regard to the issue. On the basis of that record, I find that, even were the doctrine available as a defense in this action, Dr. Stanford was not a borrowed servant under Wisconsin law.

The four questions pertinent to the analysis of whether a person is a borrowed servant are set forth in *Meka v. Falk Corp.*, 102 Wis.2d 148, 151, 306 N.W.2d 65 (1981):

"(1) Did the employee actually or impliedly consent to work for the special employer?

"(2) Was the employee performing the special employer's work at the time of the injury?

"(3) Did the special employer have the right to control the details of the work being performed?

"(4) Was the work of the employee primarily for the benefit of the special employer?"

It is the final requirement which the government fails to meet. It is conceivable

that a civilian doctor could request help from an Air Force doctor and that if the help were given, the civilian doctor would have benefitted. Whether the Air Force would allow such an event is, however, highly questionable. Gen. Myers testified that the purpose of permissive TDY orders was to benefit the Air Force, not an individual officer. It is highly unlikely then, that any benefit to a civilian doctor would form a legitimate basis for TDY to be granted.

Viewing the events charitably, one could perhaps see that the reason for Dr. Stanford's TDY was, as Gen. Myers testified, to improve Dr. Stanford's surgical skills for the benefit of the Air Force. Being less charitable, one sees that the real benefit to the Air Force was to get Dr. Stanford off its hands for a while to prohibit scandal and further dissension among the doctors at Wilford Hall. In short, sending Dr. Stanford to Milwaukee was a good way to avoid a nasty embarrassment to the Air Force.

On the other hand, CVSA offered fellowships to provide training to surgeons. That through this method they also obtained inexpensive, or in this case, free labor is not really the point; they could have offered the fellowship to a number of persons. There were many more applicants for fellowships with CVSA than there were positions available.

That Dr. Stanford was not working primarily for the benefit of CVSA is virtually admitted in the government's post-trial brief at 28, 29, in which reliance is placed on Dr. Flemma's testimony:

> "The Milwaukee doctors accepted a trainee to teach and supervise. Dr. Stanford came to Milwaukee to be trained and to be taught by CVSA. He was not in Milwaukee merely to help CVSA with their heavy surgery schedule ... There was no question that Dr. Stanford was stating to CVSA that he felt he needed some training ... Dr. Stanford served in that capacity only."

This is, in short, not a situation in which Dr. Stanford's work was primarily for the benefit of the special employer.

### Informed Consent and the Amended Administrative Claim

In July, 1981, plaintiffs amended their administrative claim *nunc pro tunc*, and filed a motion for leave to amend their complaint here by adding allegations that the United States was negligent in failing to advise CVSA or plaintiffs of the incompetence of Dr. Stanford, in failing to advise CVSA and plaintiffs of the mortality and morbidity rates of Dr. Stanford, in failing to make Exhibits 1 and 2 available to CVSA and the plaintiffs, and in engaging in conduct that prevented dissemination of information pertaining to the competence of Dr. Stanford. At the conclusion of the trial, I allowed plaintiffs to amend the complaint to conform to the proof.

The United States argues that this court lacks jurisdiction over the amendment, which raises, in its view, a separate issue of informed consent. The government argues that there is no administrative procedure to allow for an amendment *nunc pro tunc*, and because the filing of a claim six months prior to bringing suit is a jurisdictional prerequisite to an FTCA claim, this court lacks jurisdiction over the claim. The government acknowledges that so long as plaintiffs characterize the failure to communicate mortality figures to CVSA as a "risk" of Mrs. Green's surgery, the claim could be litigated if the jurisdictional requirements had been met. However, the government argues that if a misrepresentation occurred, then the amendment is barred because no action for negligent misrepresentation is available. See: 28 U.S.C. § 2680(h).

It is unnecessary to enter the jurisdictional maze. The allegations of the amended complaint that Dr. Stanford and the government prevented CVSA and Mrs. Green from knowing about the events at Wilford Hall are another facet of alleged negligence against Dr. Stanford, a facet revealed through the pretrial discovery procedures of the federal rules. The allegation that the government—apparently through persons other than Dr. Stanford—prevented dissemination of the information will not be considered in the apportionment of negligence.

To prevail in a medical malpractice action a plaintiff must prove that a doctor failed to exercise the degree of skill usually exercised by the average practitioner acting in the same or similar circumstances. *Shier v. Freedman*, 58 Wis.2d 269, 206 N.W.2d 166 (1973); *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis.2d 1, 227 N.W.2d 647 (1975). In order to exercise the appropriate degree of skill, a doctor must possess that degree of skill or care or the medical judgment necessary to allow him to exercise it. By taking the responsibility for a surgical procedure, a surgeon represents that he possesses the skill and care ordinarily possessed by persons performing similar procedures. See: *Perin v. Hayne*, 210 N.W.2d 609, 615 (Iowa 1973); 61 Am.Jur.2d § 205, p. 338.

Events in Texas show, to my satisfaction, that Dr. Stanford did not possess or regularly exercise, ordinary care. He was rough, sometimes careless. He did not possess good medical judgment. On one occasion, he scheduled an extremely risky operation, left it to residents, was not in the hospital when an emergency arose, and in fact did not go to the hospital when informed of the problem.

Dr. Stanford clearly knew or should have known that his skills were lacking. Both Dr. Knauf and Dr. Akins testified that they told him so. He was fully aware of the rebellion of the cardiologists. He knew that part of Dr. Ebert's job was to evaluate his performance. He knew Gen. Myers was searching for a solution to the problem. He claims that no one told him in so many words that he was incompetent, assuming apparently that if no one told him he was incompetent, he could not have known that his skills were lacking. His position on this issue is untenable.

The events in Texas are relevant to the operation on Mrs. Green. They lend credibility to the testimony of others that Dr. Stanford carelessly neglected to perform safety checks which he was instructed to perform. They place the responsibility for what he did directly on him—that is, because Dr. Stanford knew what had happened in Wilford Hall and Dr. Mullen did not, Dr. Stanford is directly responsible for his own negligence. Dr. Mullen, as primary physician, was justified in relying—in the absence of knowledge of Dr. Stanford's background—on the skill to be reasonably expected of a cardiothoracic surgeon who presented himself as did Dr. Stanford.

*Negligence*

Under the standard of care applicable to him, Dr. Stanford was, beyond any doubt, causally negligent. He was responsible for cannulating Mrs. Green. He had been instructed as to how it should be done. He was told to use two safety procedures, either one of which would have prevented the reversal of the lines. He performed neither one. Furthermore, by his own admission, it was his responsibility to watch the directional flow of the liquid in the line when the machine was turned on. He failed to do so.

Plaintiffs presented expert witnesses, all of whom stated that having been instructed to perform the tests, Dr. Stanford, by not performing the tests, deviated from the standard of care required. In fact, many defense witnesses do not disagree with that judgment.

There is a type of negligence where a doctor's medical judgment may have been bad on a close question of, for instance, the amount of drugs to prescribe. On the other hand, there is negligence such as involved in the Green operation, negligence which no one can dispute:

"... Laymen may be able to conclude that there was negligence, without expert testimony, where a sponge or surgical instrument was left in an incision or where the wrong organ or other body part was removed in surgery." *Christianson v. Downs*, 90 Wis.2d 332, 279 N.W.2d 918 (1979).

In such a case, there comes a time when one cannot shift the blame, when every denial of responsibility weakens one's case. Dr. Stanford argues that most of the other persons in the operating room were negligent during the line reversal; however, he

maintains that he was not causally negligent. That position is not only untenable, but arrogant.

Dr. Stanford was negligent, and his negligence was a direct cause of the tragic injury that occurred in this case.

### Comparison of Negligence

Although the claim for contribution was severed prior to trial, I deem it appropriate to state my views as to the apportionment of negligence based on what I have seen presented during this trial.

■ William Signorini, an experienced physician's assistant, was causally negligent. He placed a cannula on the aortic line, which should have been left without one. The improper connection caused him to arrange the lines improperly on the operating table, thus setting the stage for what followed. Without Mr. Signorini's initial acts of negligence, the line reversal would not have occurred.

■ Dr. Mullen was also causally negligent. Five minutes into the operation, he knew something was wrong. He made attempts to discover the problem while continuing the surgery. About 15–20 minutes into the operation, he stopped the procedures and the reversal of the lines was discovered. He is not to be faulted for not thinking immediately that the lines might be reversed, for no one at trial had ever seen a line reversal before. It is not the sort of thing that usually goes wrong. However, Dr. Mullen must bear responsibility as lead surgeon because of his failure to more quickly investigate and find the cause of the irregular pressure readings and the bright red blood in the caval lines.

Dr. Stanford was the board certified surgeon responsible for the cannulation of the patient. He had given no notice to CVSA that he was anything less than an experienced cardiovascular surgeon who wanted to further improve his skills. He neglected to perform two procedures which he had been told to do, procedures which would have caught Mr. Signorini's error. As did the others, he neglected to watch the directional flow of the fluid when the machine was turned on.

I have reviewed the evidence presented on the activities of others alleged to have been negligent and found it unpersuasive. The causal negligence in this case, based on what I have seen, is shared only by Dr. Stanford, Dr. Mullen and Mr. Signorini.

■ The next step is a comparison of the causal negligence. Dr. Mullen, in my view, was 16% negligent. As between Mr. Signorini and Dr. Stanford, it must be noted that Signorini was a mere assistant to the physician in the operating room. Signorini, and for that matter no one else, can be held responsible for failing to supervise or question the procedures of Dr. Stanford who held himself out to be a competent and experienced cardiothoracic surgeon. It was Dr. Stanford's responsibility to see that Mrs. Green was properly connected to the heart-lung machine, and he failed to discharge that responsibility. Based on the evidence presented during this trial, I find Signorini's negligence to be 22%. Dr. Stanford must shoulder 62% of the responsibility for what happened to Mrs. Green.

### DAMAGES

#### 1. Past Medical Expenses

Plaintiffs argue that the collateral source rule to which Wisconsin adheres prevents an offset from any eventual damage award of the $195,899.00 in expenses incurred at the Veterans Administration (VA) Hospital in Wood, Wisconsin. Plaintiffs argue that because Mrs. Green is a veteran, she would be entitled to stay at the VA if she were injured by a tortfeasor other than the government, and that any award would not be diminished by the amount incurred at the VA. Therefore, plaintiffs distinguish the case from a situation in which a defendant injures the person and then provides gratuitous medical services, citing *Smith v. United Services Automobile Association*, 52 Wis.2d 672, 190 N.W.2d 873 (1971).

■ Wisconsin follows the collateral source rule. *Rixmann v. Somerset Public*

*Schools*, 83 Wis.2d 571, 266 N.W.2d 326 (1978); *Foss v. Town of Kronenwetter*, 87 Wis.2d 91, 273 N.W.2d 801 (1978). However, the question on which Wisconsin law does not control is whether a benefit received from the government is, in fact, collateral to an FTCA judgment. To answer that question one must look to federal law. See: *Savannah Sledge v. United States*, C.A. # 76–C–493 (E.D.Wis. 4/30/81); *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954).

■ Courts analyze the question of whether VA benefits are collateral to an FTCA judgment by discussing whether the fund from which each is paid is the same. Both are paid out of the general treasury, and to allow plaintiff to recover both is to allow a double recovery from the same source. The court stated in *Feeley v. United States*, 337 F.2d 924, 927 (3d Cir. 1964):

> "To allow the plaintiff to recover for this item in his damages would not only result in a double recovery for him, but also a double payment out of the general treasury by the United States."

See also: *Smith v. United States*, 587 F.2d 1013 (3d Cir. 1978); *Mosley v. United States*, 538 F.2d 555 (4th Cir. 1976). Plaintiffs' damage award here will not include the expenses incurred at the VA.

Under this reasoning, the government cannot attempt to recover that amount from Mr. Green. The government, however, will be entitled to a setoff representing the percentage of negligence attributable to Dr. Mullen[2] and will have contribution rights on this item against other tortfeasors[3].

The $33,304 incurred at Milwaukee Lutheran Hospital and the University of Wisconsin Hospital is collateral to a tort claims judgment, and plaintiff is entitled to recover that amount for past medical expenses.

## 2. Future Medical Care

■ In assessing damages in cases such as this, one of the most difficult tasks is arriving at a fair and just figure for future medical care. Ideally, the system would allow an open-ended award requiring the tortfeasors to provide the necessary care for Mrs. Green for the rest of her life. Unfortunately, the law does not permit an award to be made in this fashion. Rather, the law requires that the trier of fact determine a claimant's life expectancy and award damages based on that determination. Inherent in such a system, of course, is the risk to each side. If Mrs. Green dies before reaching her life expectancy, more is paid than was actually necessary. Conversely, if she lives longer than expected, the tortfeasor is off without paying what actually should have been required. In proceeding on this issue, the hazards and potential injustices I have mentioned remain in my mind.

Testimony varied as to Mrs. Green's life expectancy. Dr. Mullen testified that viewing only her cardiovascular condition she has a normal life expectancy; he acknowledged, however, that taking her entire condition into account she does not have a normal life expectancy. Dr. John Melvin testified that her normal life expectancy would be reduced by 20%, to about 20 years. Dr. Shetty, the physician treating her at the VA, stated that she could be expected to live less than 10 years from the time of the brain damage. Drs. Flemma and Dudley Johnson, both cardiovascular surgeons, indicate that she is unlikely to live more than five years from the time of the operation. I find most realistic the testimony that Mrs. Green can be expected to live approximately ten years from the date she sustained her brain damage. For future medical care, I will allow a sum that is based on a seven-year life expectancy from the date of this decision.

Plaintiffs claim that the type of care which will be required for the rest of her

**2.** I have found Dr. Mullen's negligence to be 16%. Therefore, 16% of $195,899.00, or $31,344.00, is a credit due the government from the ultimate award.

**3.** If the 22% negligence figure ascribed to Mr. Signorini were accepted, the government would be entitled to contribution totalling $43,098.00 on this aspect of the claim.

life can only be provided by a major hospital. In Milwaukee, apparently only the VA and the Milwaukee County Medical Complex are presently able to give her the care urged by the plaintiffs. The latter's index cost figure is $513.00 per day. The government argues that Mrs. Green can be cared for at Sage Nursing Home for about $180.00 per day, plus some additional expenses for such things as physical therapy and medical supplies.

I find that Mrs. Green requires intensive hospital care. Dr. Gerda Klingbeil is board certified in physical medicine and rehabilitation, and works at Milwaukee County Medical Complex with patients such as Mrs. Green. She stated her conclusion that Mrs. Green would require 8-9 hours of nursing care per day, and that Sage Nursing Home could not care for her. In fact, Mr. Sam Morris, the Administrator of Sage Nursing Home, was unclear as to the number of hours which could be provided a patient at Sage. If Mrs. Green required five hours of care, she would be at the top of what Sage could provide. Dr. Shetty appeared comfortable in acknowledging that she required the kind of care VA was giving her. He said he was not aware of a nursing home which could provide proper care.

Mrs. Green is apparently receiving excellent care at the VA. That standard of care should be continued. The only way to insure that level of care is to provide sufficient funds to cover private hospital costs. It would be inappropriate to award damages to cover VA care if the VA were to decide that Mrs. Green could not remain there. Therefore, the cost of her future medical needs accepted by me will be $513.00 per day.

Economists for both sides, Karl Egge and Peter Danner, agree that the annual increase in medical costs equals the discount rate. Therefore, for future medical costs, I award $1,310,715 based on a present seven-year life expectancy, a portion of the ten-year expectancy I find to be appropriate today.

### 3. Pain and Suffering

Mrs. Green has severe brain damage; she is blind, quadriplegic, and has significant contractures of her extremities. She has a nasal gastric tube and has had a tracheostomy. She requires suppositories and has a Foley catheter. She requires daily range of motion exercises to keep her joints pliable.

The degree to which she is aware of her condition is in dispute. Her EEG's show primarily low level delta and theta activity—those brainwaves which are abnormal in an adult who is awake. However, a few alpha rhythms are present in some tests. Alpha rhythms are normal in an adult who is awake but who has closed eyes and is inattentive to surroundings. An evoked potential test performed by Dr. Bernard Cohen shows some functioning of the cortex of Mrs. Green's brain. Plaintiffs' Exhibit 26—a compilation of comments made by hospital personnel on Mrs. Green's chart—shows that some of the nurses, doctors, and therapists who work with her have on occasion concluded that she has a low level of awareness. Dr. Francis J. Millen, a neurologist who conducted several of the EEG's, stated that Exhibit 26 reveals that Mrs. Green is being dealt with by the hospital staff as if she is aware. Mr. Green and Mrs. Green's sister, Lucy Genian, both appear certain that Mrs. Green is on occasion aware. Mrs. Genian stated that the family has never treated Mrs. Green as anything but aware, that this is their way of dealing with the situation.

On the other hand, Dr. Assa Mayersdorf, a neurologist with the VA, states quite emphatically his belief that Mrs. Green does not respond to commands in any way whatsoever, and that all parts of her brain receiving stimuli are damaged.

It is difficult to know to what degree, if any, Mrs. Green is aware of her plight. It is not disputed that she responds to painful stimuli. One has to admire the approach taken by the family and the hospital staff in not losing sight of the chance, even if it is only a chance, that Mrs. Green is aware of her surroundings. As a legal matter,

however, I find that she is at best only occasionally aware and that that awareness is minimal. I find that appropriate damages to compensate her for past and future pain and suffering is $333,333.00.

#### 4. Lost Earning Capacity

Plaintiffs also seek damages for Mrs. Green's loss of earning capacity. I find, however, that the evidence is insufficient that Mrs. Green would have been able to work if the operation had been successful. The record indicates that she suffered several other ailments in addition to her heart condition, and that her general health was not good. Therefore, the evidence is insufficient to support an award for loss of earning capacity.

#### 5. Loss of Society and Companionship

Plaintiffs also seek damages for the loss suffered by Hoyle Green of the society and companionship of his wife. The evidence shows that prior to the operation, Mr. and Mrs. Green looked forward to living in Arkansas. The evidence also shows that they enjoyed a close relationship. Since the operation, his nearly daily trips to her bedside to help care for her evidence his feeling of loss. He has stated his firm faith that she can understand that he is there. Mr. Green has suffered a grievous loss that cannot, in real terms, be translated into a monetary award. Surely, were he to have the choice, Mr. Green would decline all the money in the world for the healthy return of his wife. Recognizing, therefore, that any award here will not be appropriate "compensation", I set past and future loss of society and companionship at $500,000.00.

IT IS THEREFORE ORDERED that plaintiffs recover:

(1) $33,304.00 in past medical expenses.

(2) $1,310,715.00 in future medical expenses.

(3) $333,333.00 for pain and suffering.

(4) $500,000.00 for loss of society and companionship; for a total of $2,177,352.00 [4].

---

[4]. Because Dr. Mullen has "Pierringered" (see *Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963), incorrectly noted and cited as *Pieringer v. Hoger*, 21 Wis.2d 82 on page 2 of the release executed on May 29, 1980 by Hoyle Green individually and as Guardian for Takuye Green) out of this case, judgment against the government will be entered for $2,177,352.00 less 16% ($348,376.00) of that sum and 16% ($31,344.00) of the $195,899.00 in past medical expenses incurred at the VA, for a total of $1,797,632.00, plus statutory costs. The government's contribution rights against tortfeasors other than Dr. Mullen are preserved. As to the Greens, they have actually received $1,797,632.00 here, $575,000.00 previously paid by Dr. Mullen and $195,899.00 from the government's general treasury in the form of medical benefits at the VA, for a total of $2,568,531.00, less costs of collection.