BONSAL, Senior District Judge.
The United States appeals from a judgment of the United States District Court for the Eastern District of Wisconsin, entered January 21, 1982, holding the United States liable to the plaintiffs Hoyle and Takuye Green for $1,797,632 plus costs in a medical malpractice action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. Following a twelve-day trial to the court, the district court, Evans, J., determined that the United States was liable for the negligence of an Air Force surgeon, Dr. William Stanford, during an operation on Takuye Green. In this appeal, the United States contends that Dr. Stanford was the borrowed servant of Cardiovascular Surgery Associates (“CVSA”), under whose auspices the operation was performed, and thus CVSA rather than the United States is vicariously liable for his negligence. In addition, the government asserts that the district court’s award included punitive damages, in violation of 28 U.S.C. § 2674, because the court failed to reduce the judgment by the full amount the plaintiffs received in settlement from a joint tortfeasor. We disagree with these arguments and accordingly affirm the judgment of the district court.
BACKGROUND
The facts are set forth in detail in the district court’s opinion, reported at 530 F.Supp. 633, and need only be summarized here. This case arises out of a coronary by-pass operation on plaintiff Takuye Green at Milwaukee Lutheran Hospital on May 2, 1978. The operation was performed under the direction of Dr. Donald Mullen, one of three physicians practicing through CVSA. At the time of the operation, Dr. William Stanford was working at CVSA as a fellow on permissive temporary duty from the Air Force. As the first assistant on the operation, Dr. Stanford was responsible for opening the patient’s chest and connecting the lines between the patient and a heart-lung machine.
The district court found that Dr. Stanford failed to follow certain routine procedures in accomplishing this task. These procedures, which Dr. Stanford had been instructed to follow, were designed to insure that the lines were properly connected. William Signorini, a physician’s assistant, reversed the arterial and venous lines in the course of preparing them to be inserted into the patient’s chest. Because the safety procedures were not carried out by Dr. Stanford, the lines were improperly connected to Mrs. Green. After the heart-lung machine was turned on, no one in the operating room observed the flow of blood through the lines until after the operation began. Irregularities in Mrs. Green’s arterial and venous pressures were noticed during the operation and steps were taken to combat the problem. However, it was not until 15 or 20 minutes had elapsed that the lines were finally traced back to the machine and the error discovered. As a result, Mrs. Green suffered extensive, irreversible brain damage and is now a blind quadriplegic.
When the Greens first brought this action, Dr. Stanford was named as a defendant. The government moved to dismiss him as a party defendant, pursuant to the Medical Malpractice Immunity Act, 10 U.S.C. § 1089, which makes an action against the United States under the Federal Tort Claims Act the sole remedy for plaintiffs who allege malpractice by a military physician. The district court granted the motion, with no objection from the plaintiffs, since Dr. Stanford’s status as an Air Force officer clearly rendered him immune from suit under the terms of the Act.
Prior to obtaining the fellowship with CVSA, Dr. Stanford was Chief of the Car-diothoracic Surgery Service at Wilford Hall, Lackland Air Force Base, San Antonio, Texas, a position he had held since 1969. In *1161 colleagues apparently became concerned that his surgical skills were inadequate. Statistical studies revealed that the mortality rate for his patients was approximately 40%, while the average mortality rate for the patients of other surgeons at Wilford Hall was only 10%. On his own initiative, Dr. Stanford applied for and received a fellowship with CVSA in Milwaukee, with a view to retraining himself in surgical procedures. Dr. Stanford’s commanding officer signed a temporary duty (“TDY”) order so that he remained on the Air Force payroll while working at CVSA. The Air Force did not inform CVSA of the controversy involving Dr. Stanford at Wilford Hall.
The district court found that Dr. Stanford was 62% negligent in causing the injuries suffered by Mrs. Green, Dr. Mullen was 16% negligent, and William Signorini was 22% negligent. The court awarded the plaintiffs a total of $2,177,352 in damages for past and future medical expenses, pain and suffering, and loss of society and companionship. Dr. Mullen had previously entered into an out-of-court settlement of plaintiffs’ claims against him in the amount of $575,000. Accordingly, the district court reduced the $2,177,352 award by 16% to $1,797,632.[1] Plaintiffs therefore received $575,000 from Dr. Mullen and $1,797,632 from the government, in addition to $195,-899 in the form of medical benefits at a V.A. Hospital, for a total of $2,568,531.[2]
DISCUSSION
The Federal Tort Claims Act (“FTCA”), 28 U.S.C. § 1346(b), provides that:
“the District Court ... shall have exclusive jurisdiction of civil actions on claims against the United States for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.”
The term “employee of the Government” is defined in 28 U.S.C. § 2671 to include “members of the military or naval forces of the United States ..., temporarily or permanently in the service of the United States, whether with or without compensation.” The same section of Title 28 provides that “ ‘acting within the scope of his office or employment’, in the case of a member of the military or naval forces of the United States, means acting in the line of duty.” By virtue of the FTCA, the United States has waived its sovereign immunity with respect to tort claims and rendered itself liable “in the same manner and to the same extent as a private individual under like circumstances.” 28 U.S.C. § 2674. The principal limitation on this liability is that punitive damages cannot be awarded against the United States. Id.
In 1976 Congress supplemented the FTCA insofar as it relates to malpractice actions brought against military physicians. Part (a) of the Medical Malpractice Immunity Act (“Malpractice Act”), 10 U.S.C. § 1089, provides that:
“The remedy against the United States provided by Sections 1346(b) and 2672 of title 28 for damages for personal injury, including death, caused by the negligent or wrongful act or omission of any physician ... of the armed forces ... in the performance of medical, dental, or related health care functions ... while acting within the scope of his duties or employ *1162 ment therein or therefor shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against such physician . .. whose act or omission gave rise to such action or proceeding.”
As the legislative history makes clear, the purpose of the Malpractice Act was to “[m]ake the Federal Tort Claims Act the exclusive remedy for injuries arising from malpractice by medical personnel acting within the scope of their duties for the Department of Defense.” S.Rep. No. 1264, 94th Cong., 2d Sess. 2, reprinted in 1976 U.S.Code Cong. & Ad.News 4443, 4444.
The district court’s findings regarding the causes of Mrs. Green’s injuries and the value of the plaintiffs’ loss are not challenged here. Only two issues are before us, one relating to liability and the other to damages.
I. Liability
The United States contends that it cannot be held vicariously liable for Dr. Stanford’s negligence because at the time of the operation on Mrs. Green he was the borrowed servant[3] of CVSA in Milwaukee (the “special” employer). The FTCA requires us to apply the law of Wisconsin in deciding this issue, as the accident occurred in that state. The district court correctly stated that the test for determining whether an employee qualifies as a borrowed servant under Wisconsin law requires four questions to be answered in the affirmative:
“(1) Did the employee actually or impliedly consent to work for the special employer?
(2) Was the employee performing the special employer’s work at the time of the injury?
(3) Did the special employer have the right to control the details of the work being performed?
(4) Was the work of the employee primarily for the benefit of the special employer?”
DePratt v. Sergio, 102 Wis.2d 141, 143, 306 N.W.2d 62, 63 (1981); Seaman Body Corp. v. Industrial Comm’n, 204 Wis. 157, 163, 235 N.W. 433, 436 (1931); see also Simmons v. Atlas Vac Machine Co., 493 F.Supp. 1082, 1083 (E.D.Wis.1980). If each of these requirements is satisfied, liability for torts committed by the employee attaches to the special employer instead of the general employer. The district court held that the fourth requirement was not satisfied here, finding that Dr. Stanford’s fellowship was primarily for the benefit of the Air Force, not CVSA. It therefore concluded that Dr. Stanford did not become the borrowed servant of CVSA.[4]
*1163 Wisconsin law, following the approach taken by the Restatement of Agency, “starts with the inference that the employee remains in the employ of the general employer.” “Finagrain” Compagnie Com., Etc. v. Miller Compressing Co., 349 F.Supp. 288, 291 (E.D.Wis.1972). The Restatement of Agency indicates that a person who is doing work for a special employer may still be considered the employee of his general employer:
“In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.”
Restatement (Second) of Agency § 227 comment b (1958); Huckstorf v. Vince L. Schneider Enterprises, 41 Wis.2d 45, 50, 163 N.W.2d 190, 193 (1968) (quoting same); accord Dellums v. Powell, 184 U.S.App.D.C. 324, 329, 566 F.2d 216, 221 (D.C.Cir.1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161, reh’g denied, 439 U.S. 886, 99 S.Ct. 234, 58 L.Ed.2d 201 (1978); Doman v. United States, 460 F.2d 425, 428 (9th Cir.1972). The mere fact that Dr. Stanford was working under the supervision of other physicians at CVSA at the time of the accident did not make him the borrowed servant of CVSA. Under Wisconsin law, the government must also show that the work done by Dr. Stanford was primarily for the benefit of CVSA, the special employer, rather than the Air Force.
The government contends that the district court should have inquired “whether the work being done at the time of the incident in question, i.e., Mrs. Green’s operation, was primarily for the benefit of the United States.” Br. & App. of Defendant and Third-Party Plaintiff-Appellant at 17 (emphasis added). In support of this contention, the government cites comment a to § 227 of the Restatement of Agency, as quoted in Meka v. Falk Corp., 102 Wis.2d 148, 156-57 n. 12, 306 N.W.2d 65, 70 (1981):
“Since the question of liability is always raised because of some specific act done, the important question is not whether or not [the employee] remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other....”
However, even if it were true that Dr. Stanford was acting both “in the business of” and “under the direction of” CVSA, the evidence simply does not support the conclusion that his work—however narrowly defined—was of primary benefit to CVSA.
While CVSA may have decided to offer Dr. Stanford a fellowship with the expectation that he would contribute something to the group’s medical practice in exchange for the training provided him, it is clear that the fellowship was intended to benefit the government and Dr. Stanford more than CVSA. Unlike the usual case of an employee being loaned by his initial employer to another employer to do work which the second employer must pay for, see, e.g., Huckstorf v. Schneider Enterprises, supra, Dr. Stanford himself sought the unpaid fellowship at CVSA in order to improve his surgical skills. While at CVSA he continued to receive his salary from the Air Force. In this connection, the district court noted that it is highly unlikely that the Air Force would have agreed to this arrangement had it not felt it would benefit from it. Indeed, Air Force regulations governing permissive TDY orders provide that, “Such duty must be clearly of primary benefit to the Air Force rather than the individual.” Br. & App. of Exhibits of Plaintiffs-Appel-lees at 25. While this requirement does not necessarily show that the Air Force benefit-ted more from Dr. Stanford’s work in Milwaukee than did CVSA, it strongly suggests that this was the case. There can be no doubt that Dr. Stanford’s fellowship suited the government’s needs: it had the immediate advantage of forestalling an even greater controversy at Wilford Hall than had already arisen concerning his competence as a surgeon, and it had the long-term advantage of improving his skills.
*1164 Dr. Stanford’s position at CVSA does not conform to the model of a borrowed servant that emerges from the Restatement of Agency. Comment a to § 227, quoted in Meka v. Falk Corp., 102 Wis.2d at 156-57 n. 12, 306 N.W.2d at 70, states that the question of whether a loaned employee becomes the servant of his special employer generally depends on certain factors set forth in § 220(2).[5] When applied to the facts of this case, these factors lead to the conclusion that Dr. Stanford cannot be considered a borrowed servant. For example, the work done by Dr. Stanford was of a kind normally performed by highly skilled specialists; Dr. Stanford himself was a board-certified thoracic surgeon;[6] he went to CVSA as a fellow, not an employee; he was to remain there for a limited period of time and was not to be compensated by CVSA for his work; and the government, as distinguished from a private business enterprise, is not accustomed to loaning its employees to other employers.
We agree with the district court that Dr. Stanford’s work at CVSA was not primarily for the benefit of CVSA. Therefore, under the law of Wisconsin Dr. Stanford was not the borrowed servant of CVSA and the United States remained liable for his negligence during the operation on Mrs. Green.[7]
II. Damages
The district court awarded damages as follows;
Past medical expenses (Milwaukee
Lutheran Hospital and University of Wisconsin Hospital) $ 33,304
Future medical expenses 1,310,715
Pain and suffering 333,333
Loss of society and companionship 500.000
$2,177,352
The damages were allocated by the district court among the tortfeasors it found to be causally negligent, as follows:
*1165 Dr. Stanford 62%
Dr. Mullen 16%
Mr. Signorini 22%
The court noted that Dr. Mullen had previously made an out-of-court settlement with the plaintiffs in the amount of $575,000 and that the plaintiffs had delivered a “Pier-ringer release” to Dr. Mullen in connection with the settlement. Therefore, the court credited the government 16% of the award ($348,376) and 16% of the $195,899 in past medical expenses incurred at the V.A. Hospital ($31,344).[8] When the balance of the Dr. Mullen settlement ($575,000 less $348,-376) and the balance of the past medical expenses at the Y.A. Hospital ($195,899 less $31,334) and added to the damages awarded by the district court, plaintiffs’ recovery equals $2,568,531, or $391,179 more than the district court’s award of $2,177,352. The government contends that this difference[9] constitutes punitive damages against the United States, in violation of the FTC A. 28 U.S.C. § 2674.
Under the FTCA the appropriate measure of damages must be determined by reference to the law of the state where the tort occurred. 28 U.S.C. § 1346(b); Smith v. Pena, 621 F.2d 873, 881 (7th Cir.1980). Similarly, the effect of a release from liability must be determined according to that state’s law. Montellier v. United States, 315 F.2d 180, 185 (2d Cir.1963); Robinson v. United States, 408 F.Supp. 132, 136 (N.D.Ill.1976). As to the out-of-court settlement with Dr. Mullen, the applicable Wisconsin law is set forth in Pierringer v. Hoger, 21 Wis.2d 182, 189, 124 N.W.2d 106, 110 (1963). In Pierringer the Wisconsin Supreme Court approved a form of release which frees a settling tortfeasor of liability and limits the damages recoverable from non-settling tortfeasors to the percentage of liability allocated to them. The court stated:
“[I]n order for a plaintiff to give a release or covenant which would protect the settling tortfeasor from a claim of contribution^] the plaintiff must agree to satisfy such percentage of the judgment he ultimately recovers as the settling tort-feasor’s causal negligence bears to all the causal negligence of all the tort-feasors.”
Thus, the issue raised by the government is whether the release given by the plaintiffs to Dr. Mullen can be given the effect intended by Pierringer without violating the FTCA’s ban on punitive damages.
We hold that it can. Punitive damages are intended to penalize a defendant for willful misconduct. See W. Prosser, Handbook of the Law of Torts 9 (4th ed. 1971). Clearly, that was not the court’s intent here. Neither can the excess be characterized as punitive in the same sense that the plaintiff’s recovery in Harte v. United States, 415 F.2d 259 (5th Cir.1969), was deemed to be. In Harte, a case on which the government relies, the court stated that a Georgia statute which permitted the recovery of more than the survivor’s actual loss in a wrongful death action was punitive. It therefore concluded that “the trial court, in a federal tort claims act [sic], cannot award a judgment in excess of the injury suffered by the survivor .... ” 415 F.2d at 264-65.
Here, by contrast, the district court’s judgment was not itself in excess of the plaintiffs’ actual loss. Rather, the plaintiffs will only recover more than that amount because of the favorable settlement which they obtained from Dr. Mullen prior to trial. Therefore, what the government terms excess recovery is merely the result of giving plaintiffs the benefit of their own bargain with another tortfeasor. Finally, any excess recovery by the Greens will be *1166 paid by Dr. Mullen, not by the United States.
In view of the foregoing, the amount received by the plaintiffs in excess of the district court’s award does not constitute punitive damages against the government. The district court properly calculated the government’s liability and its award will not be disturbed.
For the aforementioned reasons, the decision of the district court is Affirmed.

. As an initial matter, the plaintiffs contend that application of the borrowed servant rule here would undermine the purpose of the Malpractice Act. According to the plaintiffs, if the borrowed servant rule were applied Dr. Stanford would be exposed to liability instead of immunized from it, as the Act contemplates. But application of the borrowed servant rule will not subject Dr. Stanford to potential liability. Pursuant to the Malpractice Act, he was properly dismissed as a defendant in the case. Whether or not the borrowed servant rule ought to be applied is a question that must be answered by reference to “the law of the place where the act or omission occurred.” 28 U.S.C. § 1346(b). If Wisconsin law dictates that some party other than the United States should be held vicariously liable for Dr. Stanford’s negligence, the result would in no way contravene the purpose of the Malpractice Act. Cf. Baker v. Barber, 673 F.2d 147 (6th Cir.1982) (immunity afforded by Malpractice Act bars suit against military physicians even though Federal Employee Compensation Act also barred plaintiffs from recovering under FTCA).

. While it allowed the issue to be tried, the district court thought the government should be barred from pleading the borrowed servant rule, on the ground that the Malpractice Act and the FTCA must be read in pari materia. In the district court’s reasoning, if the phrase “acting within the scope of his ... employment” has the same meaning in each statute, the government cannot escape liability under the FTCA for Dr. Stanford’s negligence once it has conceded that he was acting in the line of duty. However, Wisconsin law appears to support the government’s argument that nothing precludes it from claiming Dr. Stanford was acting within the scope of his general employment at the same time that he was the borrowed servant of a special employer. See Meka v. Falk Corp., 102 Wis.2d 148, 157, 306 N.W.2d 65, 71 (1981).

. The court also reduced the judgment against the government by 16% of $195,899, the total amount of past medical expenses at the V.A. Hospital where Mrs. Green was cared for.

. The district court stated that “the government’s contribution rights against tortfeasors other than Dr. Mullen are preserved.” However, this appeal is not concerned with the rights of the United States against others who assisted at the operation. In an order dated September 21, 1981 the district court granted the motion of the third-party defendants for severance of the government’s claims against them from the trial of the original action between the Greens and the United States.

. These include:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is. employed;
(g) the method of payment whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

. Dr. Stanford’s status as a professional with special skills underscores the difference between this case and the more typical one involving the borrowed servant rule. Typically, the employee is an hourly wage-earner whose work must be closely supervised. See, e.g., Meka v. Falk Corp., supra, (“unskilled laborer”); Freeman v. Krause Milling Co., 43 Wis.2d 392, 168 N.W.2d 599 (1969) (janitorial worker); Huckstorf v. Schneider Enterprises, supra (crane operator). In that situation, it naturally makes sense to impute liability to the special employer if the employee was following his directions at the time of the accident. The present case falls somewhere in between the typical case and a case like Doman v. United States, supra, where the court held that the employee “was cooperating with, rather than becoming subservient to, the ‘borrowing’ employer.” 460 F.2d at 428.

.Plaintiffs’ argument that the government is precluded from raising the defense of the borrowed servant rule on grounds of both waiver and estoppel is meritless. As to the claim of waiver, the government admits that its initial answer made no mention of the borrowed servant rule. However, the district court permitted the government to file an amended answer asserting the borrowed servant rule as an affirmative defense, with no objection from the plaintiffs. As to the estoppel claim, it is true that the defense was first raised after the running of the statute of limitations that applies to tort actions under Wisconsin law, so that a suit against Dr. Stanford individually could no longer have been brought. However, Dr. Stanford was in any case protected from liability by the Malpractice Act. Therefore, even if the government intentionally waited until the limitations period had expired before raising the defense, plaintiffs cannot argue that they relied to their detriment on the government’s conduct.

. Mrs. Green, being a veteran, was entitled to medical treatment at the V.A. Hospital. The district court did not include in its award the past medical expenses at the V.A. Hospital as to do so would have resulted in double recovery.

. The government appears to have miscalculated this figure. The excess recovery about which the government complains is properly determined by subtracting from the amount of the settlement ($575,000) the two amounts by which the district court actually reduced the judgment against the government (16% of $2,177,352 and 16% of $195,899). This results in a figure of $195,280.