709 F.2d 1158
 Hoyle GREEN, Individually and as Guardian of Takuye Green,
Incompetent, Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant and Third-Party,
Plaintiff-Appellant,
v.
William SIGNORINI, Patricia McNabb-Kaminski, James Zischler,
Dr. Derward Lepley, Dr. Robert Flemma, Cardiovascular
Surgery Associates, S.C. and St. Paul Fire and Marine
Insurance Co., Third-Party Defendants.
 No. 82-1475.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 1, 1982.
Decided June 7, 1983.
 
 1
 Barbara B. Berman, Asst. U.S. Atty., Milwaukee, Wis., for defendant and third-party plaintiff-appellant.
 
 
 2
 William M. Cannon, Habush, Habush & Davis, S.C., Milwaukee, Wis., for plaintiffs-appellees.
 
 
 3
 Before BAUER and COFFEY, Circuit Judges, and BONSAL,* Senior District Judge.
 
 
 4
 BONSAL, Senior District Judge.
 
 
 5
 The United States appeals from a judgment of the United States District Court for the Eastern District of Wisconsin, entered January 21, 1982, holding the United States liable to the plaintiffs Hoyle and Takuye Green for $1,797,632 plus costs in a medical malpractice action brought under the Federal Tort Claims Act, 28 U.S.C. Sec. 2671, et seq. Following a twelve-day trial to the court, the district court, Evans, J., determined that the United States was liable for the negligence of an Air Force surgeon, Dr. William Stanford, during an operation on Takuye Green. In this appeal, the United States contends that Dr. Stanford was the borrowed servant of Cardiovascular Surgery Associates ("CVSA"), under whose auspices the operation was performed, and thus CVSA rather than the United States is vicariously liable for his negligence. In addition, the government asserts that the district court's award included punitive damages, in violation of 28 U.S.C. Sec. 2674, because the court failed to reduce the judgment by the full amount the plaintiffs received in settlement from a joint tortfeasor. We disagree with these arguments and accordingly affirm the judgment of the district court.
 
 BACKGROUND
 
 6
 The facts are set forth in detail in the district court's opinion, reported at 530 F.Supp. 633, and need only be summarized here. This case arises out of a coronary by-pass operation on plaintiff Takuye Green at Milwaukee Lutheran Hospital on May 2, 1978. The operation was performed under the direction of Dr. Donald Mullen, one of three physicians practicing through CVSA. At the time of the operation, Dr. William Stanford was working at CVSA as a fellow on permissive temporary duty from the Air Force. As the first assistant on the operation, Dr. Stanford was responsible for opening the patient's chest and connecting the lines between the patient and a heart-lung machine.
 
 
 7
 The district court found that Dr. Stanford failed to follow certain routine procedures in accomplishing this task. These procedures, which Dr. Stanford had been instructed to follow, were designed to insure that the lines were properly connected. William Signorini, a physician's assistant, reversed the arterial and venous lines in the course of preparing them to be inserted into the patient's chest. Because the safety procedures were not carried out by Dr. Stanford, the lines were improperly connected to Mrs. Green. After the heart-lung machine was turned on, no one in the operating room observed the flow of blood through the lines until after the operation began. Irregularities in Mrs. Green's arterial and venous pressures were noticed during the operation and steps were taken to combat the problem. However, it was not until 15 or 20 minutes had elapsed that the lines were finally traced back to the machine and the error discovered. As a result, Mrs. Green suffered extensive, irreversible brain damage and is now a blind quadriplegic.
 
 
 8
 When the Greens first brought this action, Dr. Stanford was named as a defendant. The government moved to dismiss him as a party defendant, pursuant to the Medical Malpractice Immunity Act, 10 U.S.C. Sec. 1089, which makes an action against the United States under the Federal Tort Claims Act the sole remedy for plaintiffs who allege malpractice by a military physician. The district court granted the motion, with no objection from the plaintiffs, since Dr. Stanford's status as an Air Force officer clearly rendered him immune from suit under the terms of the Act.
 
 
 9
 Prior to obtaining the fellowship with CVSA, Dr. Stanford was Chief of the Cardiothoracic Surgery Service at Wilford Hall, Lackland Air Force Base, San Antonio, Texas, a position he had held since 1969. In 1976 and 1977 Dr. Stanford's colleagues apparently became concerned that his surgical skills were inadequate. Statistical studies revealed that the mortality rate for his patients was approximately 40%, while the average mortality rate for the patients of other surgeons at Wilford Hall was only 10%. On his own initiative, Dr. Stanford applied for and received a fellowship with CVSA in Milwaukee, with a view to retraining himself in surgical procedures. Dr. Stanford's commanding officer signed a temporary duty ("TDY") order so that he remained on the Air Force payroll while working at CVSA. The Air Force did not inform CVSA of the controversy involving Dr. Stanford at Wilford Hall.
 
 
 10
 The district court found that Dr. Stanford was 62% negligent in causing the injuries suffered by Mrs. Green, Dr. Mullen was 16% negligent, and William Signorini was 22% negligent. The court awarded the plaintiffs a total of $2,177,352 in damages for past and future medical expenses, pain and suffering, and loss of society and companionship. Dr. Mullen had previously entered into an out-of-court settlement of plaintiffs' claims against him in the amount of $575,000. Accordingly, the district court reduced the $2,177,352 award by 16% to $1,797,632.[1] Plaintiffs therefore received $575,000 from Dr. Mullen and $1,797,632 from the government, in addition to $195,899 in the form of medical benefits at a V.A. Hospital, for a total of $2,568,531.[2]
 
 DISCUSSION
 
 11
 The Federal Tort Claims Act ("FTCA"), 28 U.S.C. Sec. 1346(b), provides that:
 
 
 12
 "the District Court ... shall have exclusive jurisdiction of civil actions on claims against the United States for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
 
 
 13
 The term "employee of the Government" is defined in 28 U.S.C. Sec. 2671 to include "members of the military or naval forces of the United States ..., temporarily or permanently in the service of the United States, whether with or without compensation." The same section of Title 28 provides that " 'acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States, means acting in the line of duty." By virtue of the FTCA, the United States has waived its sovereign immunity with respect to tort claims and rendered itself liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. Sec. 2674. The principal limitation on this liability is that punitive damages cannot be awarded against the United States. Id.
 
 
 14
 In 1976 Congress supplemented the FTCA insofar as it relates to malpractice actions brought against military physicians. Part (a) of the Medical Malpractice Immunity Act ("Malpractice Act"), 10 U.S.C. Sec. 1089, provides that:
 
 
 15
 "The remedy against the United States provided by Sections 1346(b) and 2672 of title 28 for damages for personal injury, including death, caused by the negligent or wrongful act or omission of any physician ... of the armed forces ... in the performance of medical, dental, or related health care functions ... while acting within the scope of his duties or employment therein or therefor shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against such physician ... whose act or omission gave rise to such action or proceeding."
 
 
 16
 As the legislative history makes clear, the purpose of the Malpractice Act was to "[m]ake the Federal Tort Claims Act the exclusive remedy for injuries arising from malpractice by medical personnel acting within the scope of their duties for the Department of Defense." S.Rep. No. 1264, 94th Cong., 2d Sess. 2, reprinted in 1976 U.S.Code Cong. & Ad.News 4443, 4444.
 
 
 17
 The district court's findings regarding the causes of Mrs. Green's injuries and the value of the plaintiffs' loss are not challenged here. Only two issues are before us, one relating to liability and the other to damages.
 
 I. Liability
 
 18
 The United States contends that it cannot be held vicariously liable for Dr. Stanford's negligence because at the time of the operation on Mrs. Green he was the borrowed servant[3] of CVSA in Milwaukee (the "special" employer). The FTCA requires us to apply the law of Wisconsin in deciding this issue, as the accident occurred in that state. The district court correctly stated that the test for determining whether an employee qualifies as a borrowed servant under Wisconsin law requires four questions to be answered in the affirmative:
 
 
 19
 "(1) Did the employee actually or impliedly consent to work for the special employer?
 
 
 20
 (2) Was the employee performing the special employer's work at the time of the injury?
 
 
 21
 (3) Did the special employer have the right to control the details of the work being performed?
 
 
 22
 (4) Was the work of the employee primarily for the benefit of the special employer?"
 
 
 23
 DePratt v. Sergio, 102 Wis.2d 141, 143, 306 N.W.2d 62, 63 (1981); Seaman Body Corp. v. Industrial Comm'n, 204 Wis. 157, 163, 235 N.W. 433, 436 (1931); see also Simmons v. Atlas Vac Machine Co., 493 F.Supp. 1082, 1083 (E.D.Wis.1980). If each of these requirements is satisfied, liability for torts committed by the employee attaches to the special employer instead of the general employer. The district court held that the fourth requirement was not satisfied here, finding that Dr. Stanford's fellowship was primarily for the benefit of the Air Force, not CVSA. It therefore concluded that Dr. Stanford did not become the borrowed servant of CVSA.[4]
 
 
 24
 Wisconsin law, following the approach taken by the Restatement of Agency, "starts with the inference that the employee remains in the employ of the general employer." "Finagrain" Compagnie Com., Etc. v. Miller Compressing Co., 349 F.Supp. 288, 291 (E.D.Wis.1972). The Restatement of Agency indicates that a person who is doing work for a special employer may still be considered the employee of his general employer:
 
 
 25
 "In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it."
 
 
 26
 Restatement (Second) of Agency Sec. 227 comment b (1958); Huckstorf v. Vince L. Schneider Enterprises, 41 Wis.2d 45, 50, 163 N.W.2d 190, 193 (1968) (quoting same); accord Dellums v. Powell, 184 U.S.App.D.C. 324, 329, 566 F.2d 216, 221 (D.C.Cir.1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161, reh'g denied, 439 U.S. 886, 99 S.Ct. 234, 58 L.Ed.2d 201 (1978); Dornan v. United States, 460 F.2d 425, 428 (9th Cir.1972). The mere fact that Dr. Stanford was working under the supervision of other physicians at CVSA at the time of the accident did not make him the borrowed servant of CVSA. Under Wisconsin law, the government must also show that the work done by Dr. Stanford was primarily for the benefit of CVSA, the special employer, rather than the Air Force.
 
 
 27
 The government contends that the district court should have inquired "whether the work being done at the time of the incident in question, i.e., Mrs. Green's operation, was primarily for the benefit of the United States." Br. & App. of Defendant and Third-Party Plaintiff-Appellant at 17 (emphasis added). In support of this contention, the government cites comment a to Sec. 227 of the Restatement of Agency, as quoted in Meka v. Falk Corp., 102 Wis.2d 148, 156-57 n. 12, 306 N.W.2d 65, 70 (1981):
 
 
 28
 "Since the question of liability is always raised because of some specific act done, the important question is not whether or not [the employee] remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other...."
 
 
 29
 However, even if it were true that Dr. Stanford was acting both "in the business of" and "under the direction of" CVSA, the evidence simply does not support the conclusion that his work--however narrowly defined--was of primary benefit to CVSA.
 
 
 30
 While CVSA may have decided to offer Dr. Stanford a fellowship with the expectation that he would contribute something to the group's medical practice in exchange for the training provided him, it is clear that the fellowship was intended to benefit the government and Dr. Stanford more than CVSA. Unlike the usual case of an employee being loaned by his initial employer to another employer to do work which the second employer must pay for, see, e.g., Huckstorf v. Schneider Enterprises, supra, Dr. Stanford himself sought the unpaid fellowship at CVSA in order to improve his surgical skills. While at CVSA he continued to receive his salary from the Air Force. In this connection, the district court noted that it is highly unlikely that the Air Force would have agreed to this arrangement had it not felt it would benefit from it. Indeed, Air Force regulations governing permissive TDY orders provide that, "Such duty must be clearly of primary benefit to the Air Force rather than the individual." Br. & App. of Exhibits of Plaintiffs-Appellees at 25. While this requirement does not necessarily show that the Air Force benefitted more from Dr. Stanford's work in Milwaukee than did CVSA, it strongly suggests that this was the case. There can be no doubt that Dr. Stanford's fellowship suited the government's needs: it had the immediate advantage of forestalling an even greater controversy at Wilford Hall than had already arisen concerning his competence as a surgeon, and it had the long-term advantage of improving his skills.
 
 
 31
 Dr. Stanford's position at CVSA does not conform to the model of a borrowed servant that emerges from the Restatement of Agency. Comment a to Sec. 227, quoted in Meka v. Falk Corp., 102 Wis.2d at 156-57 n. 12, 306 N.W.2d at 70, states that the question of whether a loaned employee becomes the servant of his special employer generally depends on certain factors set forth in Sec. 220(2).[5] When applied to the facts of this case, these factors lead to the conclusion that Dr. Stanford cannot be considered a borrowed servant. For example, the work done by Dr. Stanford was of a kind normally performed by highly skilled specialists; Dr. Stanford himself was a board-certified thoracic surgeon;[6] he went to CVSA as a fellow, not an employee; he was to remain there for a limited period of time and was not to be compensated by CVSA for his work; and the government, as distinguished from a private business enterprise, is not accustomed to loaning its employees to other employers.
 
 
 32
 We agree with the district court that Dr. Stanford's work at CVSA was not primarily for the benefit of CVSA. Therefore, under the law of Wisconsin Dr. Stanford was not the borrowed servant of CVSA and the United States remained liable for his negligence during the operation on Mrs. Green.[7]
 
 II. Damages
 
 33
 The district court awarded damages as follows:
 
 
 34
 Past medical expenses (Milwaukee
 Lutheran Hospital and University
 of Wisconsin Hospital) $ 33,304
Future medical expenses 1,310,715
Pain and suffering 333,333
Loss of society and companionship 500,000
 ----------
 $2,177,352
 
 
 35
 The damages were allocated by the district court among the tortfeasors it found to be causally negligent, as follows:
 
 
 36
 Dr. Stanford 62%
Dr. Mullen 16%
Dr. Signorini 22%
 
 
 37
 The court noted that Dr. Mullen had previously made an out-of-court settlement with the plaintiffs in the amount of $575,000 and that the plaintiffs had delivered a "Pierringer release" to Dr. Mullen in connection with the settlement. Therefore, the court credited the government 16% of the award ($348,376) and 16% of the $195,899 in past medical expenses incurred at the V.A. Hospital ($31,344).[8] When the balance of the Dr. Mullen settlement ($575,000 less $348,376) and the balance of the past medical expenses at the V.A. Hospital ($195,899 less $31,334) and added to the damages awarded by the district court, plaintiffs' recovery equals $2,568,531, or $391,179 more than the district court's award of $2,177,352. The government contends that this difference[9] constitutes punitive damages against the United States, in violation of the FTCA. 28 U.S.C. Sec. 2674.
 
 
 38
 Under the FTCA the appropriate measure of damages must be determined by reference to the law of the state where the tort occurred. 28 U.S.C. Sec. 1346(b); Smith v. Pena, 621 F.2d 873, 881 (7th Cir.1980). Similarly, the effect of a release from liability must be determined according to that state's law. Montellier v. United States, 315 F.2d 180, 185 (2d Cir.1963); Robinson v. United States, 408 F.Supp. 132, 136 (N.D.Ill.1976). As to the out-of-court settlement with Dr. Mullen, the applicable Wisconsin law is set forth in Pierringer v. Hoger, 21 Wis.2d 182, 189, 124 N.W.2d 106, 110 (1963). In Pierringer the Wisconsin Supreme Court approved a form of release which frees a settling tortfeasor of liability and limits the damages recoverable from non-settling tortfeasors to the percentage of liability allocated to them. The court stated:
 
 
 39
 "[I]n order for a plaintiff to give a release or covenant which would protect the settling tortfeasor from a claim of contribution[,] the plaintiff must agree to satisfy such percentage of the judgment he ultimately recovers as the settling tort-feasor's causal negligence bears to all the causal negligence of all the tort-feasors."
 
 
 40
 Thus, the issue raised by the government is whether the release given by the plaintiffs to Dr. Mullen can be given the effect intended by Pierringer without violating the FTCA's ban on punitive damages.
 
 
 41
 We hold that it can. Punitive damages are intended to penalize a defendant for willful misconduct. See W. Prosser, Handbook of the Law of Torts 9 (4th ed. 1971). Clearly, that was not the court's intent here. Neither can the excess be characterized as punitive in the same sense that the plaintiff's recovery in Hartz v. United States, 415 F.2d 259 (5th Cir.1969), was deemed to be. In Hartz, a case on which the government relies, the court stated that a Georgia statute which permitted the recovery of more than the survivor's actual loss in a wrongful death action was punitive. It therefore concluded that "the trial court, in a federal tort claims act [sic], cannot award a judgment in excess of the injury suffered by the survivor ...." 415 F.2d at 264-65.
 
 
 42
 Here, by contrast, the district court's judgment was not itself in excess of the plaintiffs' actual loss. Rather, the plaintiffs will only recover more than that amount because of the favorable settlement which they obtained from Dr. Mullen prior to trial. Therefore, what the government terms excess recovery is merely the result of giving plaintiffs the benefit of their own bargain with another tortfeasor. Finally, any excess recovery by the Greens will be paid by Dr. Mullen, not by the United States.
 
 
 43
 In view of the foregoing, the amount received by the plaintiffs in excess of the district court's award does not constitute punitive damages against the government. The district court properly calculated the government's liability and its award will not be disturbed.
 
 
 44
 For the aforementioned reasons, the decision of the district court is AFFIRMED.
 
 
 45
 COFFEY, Circuit Judge, dissenting.
 
 
 46
 I respectfully dissent from the majority's decision affirming the district court's finding that Cardiovascular Surgery Associates were not responsible for the alleged malpractice of Dr. Stanford under the Wisconsin Borrowed Servant Doctrine. I am compelled to dissent because the district court and the majority of the panel of this court have misconstrued Wisconsin's Borrowed Servant Doctrine. The proper application of the decisions of Wisconsin's Supreme Court to the facts of this case mandates that this court hold that Dr. Stanford was an employee of CVSA and that any negligence attributed to him should have been included in CVSA's settlement with the plaintiff. Moreover, the trial court erred when it determined that the primary benefit of Dr. Stanford's surgical assistance to Cardiovascular Surgery Associates inured mainly to the benefit of the government. In reaching this conclusion, the court disregarded the basic premise of Wisconsin's Borrowed Servant Doctrine requiring a court to focus on the question of whether the special employer or the general employer received the primary benefit from the specific task the employee was performing at the time of the injury. Thus, the proper legal analysis required that the trial court focus on whether CVSA or the government received the primary benefit from Mrs. Green's operation rather than mistakenly focusing on whether the government or CVSA benefited from Dr. Stanford's entire (six month) fellowship program with CVSA. Furthermore, because under Wisconsin's law Dr. Stanford's negligence must be imputed to CVSA and therefore included in CVSA's settlement with the plaintiff, in holding the government liable for Dr. Stanford's negligence the majority of this court also erred in implicitly recognizing and adopting the "dual benefit" theory expressly rejected by the Wisconsin Supreme Court less than two years ago in DePratt v. Sergio, 102 Wis.2d 141, 306 N.W.2d 62 (1981).
 
 I.
 
 47
 In analyzing the panel's decision, I note that the majority opinion concedes that "the test for determining whether an employee qualifies as a borrowed servant under Wisconsin law required four questions to be answered in the affirmative." Citing Seaman Body Corp. v. Industrial Comm., 204 Wis. 157, 163, 235 N.W. 433 (1931). Both the decisions of the district court and the majority of this panel take issue only with the government's evidence concerning the fourth prong of the borrowed servant test, i.e., whether the work primarily benefited the special employer, and although they failed to discuss or analyze them, they apparently accept the fact that the government met the first three prongs of the borrowed servant test mandated by the state Supreme Court. However, I would hold at the outset that the district court committed a fundamental error when it decided to apply the fourth test almost in a vacuum, separate and distinct from the other three tests; every Wisconsin case on point analyzes each of the four tests in conjunction with one another in order that they might come to a logical and well-reasoned decision on the issue of whether the special employer (CVSA) is liable for the borrowed servant's (Dr. Stanford's) alleged negligence under the Borrowed Servant Doctrine.
 
 
 48
 The first test to be applied under Wisconsin's Borrowed Servant Doctrine is whether the employee consented to work for the special employer. It is clear that Dr. Stanford sought after and actively pursued a fellowship with CVSA and that he in fact accepted the fellowship position and assisted other CVSA surgeons during the tenure of his fellowship program. Moreover, focusing on Mrs. Green's operation, it is readily apparent that Dr. Stanford consented to work in conjunction with and under the direction of a CVSA surgeon (Dr. Mullen) who was responsible for supervising all of the members of CVSA's surgical team, including not only Dr. Stanford but also the physician's assistant, the perfusionist, the anesthesiologist and the surgical nurses. Thus, the element of consent is unquestionably present.
 
 
 49
 The second prong of the four part test is whether the employee was performing a segment of the special employer's (CVSA's) work at the time of the injury. It is beyond dispute that when Dr. Stanford, a surgeon previously certified by the American College of Surgeons, opened Mrs. Green's chest cavity, exposed her heart, administered Heparin and cannuated the heart he was performing a required preparatory segment of the CVSA heart by-pass surgical procedure. Mrs. Green was a patient of CVSA and (1) CVSA's surgeons examined Mrs. Green and after analyzing previous test data determined the necessity and extent of heart surgery required (i.e., a double, triple or quadruple by-pass); (2) CVSA scheduled the surgery; (3) CVSA's personnel supervised all of the in-patient preparatory testing performed immediately prior to Mrs. Green's surgery; (4) CVSA personnel supervised Mrs. Green's post-operative care; and (5) it is unquestioned that CVSA was to receive payment for the surgical procedure. After review, I would hold that the evidence, though not discussed or analyzed in either the opinion of the district court or the opinion of the majority of this panel, is more than sufficient to establish that Dr. Stanford was performing CVSA's "work" at the time of the injury, and thus the second prong of Wisconsin's borrowed servant test has been met.
 
 
 50
 The third element of the Wisconsin borrowed servant test is whether the special employer had the right and the authority to control and supervise the details of the operation (work) being performed by Dr. Stanford, the "borrowed servant," at the time of the injury. Again, there is no dispute that Cardiovascular Surgery Associates (specifically the surgeon in charge. Dr. Mullen) had the right, and in fact the duty and obligation, to control, direct and supervise each and every detail and step of Mrs. Green's heart by-pass surgical procedure including any services performed by the nurses and other surgical personnel, as well as any assistance given by Dr. Stanford. The plaintiff does not even attempt to claim that the government failed to establish that CVSA was in fact in complete control over each and every detail of the operation. Clearly, the first three prongs of Wisconsin's borrowed servant test have been met.
 
 
 51
 In the face of the overwhelming evidence that the first three prongs of the borrowed servant test were established by the government, both the district court and the majority paid no heed to the first three tests and concluded that through the application of only the fourth (primary benefit) test, CVSA was not liable for Dr. Stanford's actions under the Borrowed Servant Doctrine because the government primarily benefited from Dr. Stanford's fellowship with CVSA. It is my opinion that the district court and the majority, in the face of Wisconsin case law to the contrary, failed to analyze all four borrowed servant tests in conjunction with one another and incorrectly focused all of their inquiry on the fourth prong of the borrowed servant test. The Wisconsin Supreme Court has never suggested that the "primary benefit" test is the most important test, and in fact has specifically stated to the contrary and held that "[o]f these four tests, ... 'the most important one is the first [test], viz., did the employee actually or impliedly consent to work for the special employer.' " Ryan, Inc. v. ILHR Dept., 39 Wis.2d 646, 650, 159 N.W.2d 594 (1968). See also Springfield Lumber v. Indus. Comm., 10 Wis.2d 405, 409, 102 N.W.2d 754 (1960). Moreover, other cases from the Wisconsin Supreme Court and the federal court for the Eastern District of Wisconsin hold that the answer to the first test, the employee's consent to work for the special employer, can be implied from the application of the third test, i.e., "the employee's acceptance of the special employer's control and direction." Springfield Lumber, 10 Wis.2d at 411, 102 N.W.2d 754. It is thus clear from Wisconsin cases that the factors of consent and control are the most crucial factors to be considered by a court, and these factors overwhelmingly establish CVSA's liability and are not disputed by the parties in the instant case. Since Dr. Stanford expressly consented to work for CVSA, because he was performing CVSA's work at the time of the injury and as CVSA had the sole duty, right and obligation to control the details of Mrs. Green's operation, I would hold that those three elements combined with the benefit which flowed to CVSA from Dr. Stanford's assistance during Mrs. Green's heart by-pass operation require that any negligence imputed to Dr. Stanford be considered as the negligence of CVSA under Wisconsin's Borrowed Servant Doctrine.
 
 
 52
 I would also hold, based on Wisconsin case law as it has been consistently applied for at least fifty years, see Seaman Body Corp. v. Indus. Comm., 204 Wis. 157, 235 N.W. 433 (1931), that the trial court made a fundamental error concerning the focus of the fourth question: whether the work of Dr. Stanford was for the primary benefit of the government or CVSA. Rather than focusing on Mrs. Green's specific operation, the district court mistakenly focused on the entire length (six months) of Dr. Stanford's fellowship program and the events allegedly leading up to his participation in the fellowship program, and erroneously concluded that the primary benefit of the fellowship flowed to the United States Air Force. However, legal reasoning required the trial court to conduct a balancing test and focus on the question of which employer (the government or CVSA) derived the primary benefit from the specific operation (Mrs. Green's heart by-pass) which is the subject matter of this lawsuit. I know of no legal basis under Wisconsin's Borrowed Servant Doctrine to support the district court's analysis of the entire fellowship program including the fifty to sixty operations Dr. Stanford had previously assisted in prior to Mrs. Green's, in coming to the conclusion that the primary benefit flowed to the government. Wisconsin cases hold that the question of "primary benefit" is "somewhat analogous to the second test," i.e., "[w]hose was the work [the employee] was performing at the time of the injury." Huckstorf v. Vince L. Schneider Ent., 41 Wis.2d 45, 53, 163 N.W.2d 190 (1968) (emphasis added). See also "Finagrain" Compagnie Com. etc. v. Miller Compressing Co., 349 F.Supp. 288, 292 (E.D.Wis.1972). Since the second test focuses only on the specific act giving rise to the injury and is analogous to the fourth test, this unquestionably demonstrates that when answering the "primary benefit" test, controlling Wisconsin law required the district court to focus on Mrs. Green's operation and not upon the events leading up to and during Dr. Stanford's fellowship training program.
 
 
 53
 Wisconsin's Supreme Court, in all the cases interpreting the Borrowed Servant Doctrine, focuses the searchlight of the fourth prong of Wisconsin's "borrowed servant test" on what occurred during the specific act giving rise to the injury, the subject matter of the lawsuit (i.e., the operation itself). For example, in Huckstorf, the plaintiff was injured when he was struck by a bundle of plywood sheets that had been prematurely released by a crane operator at a construction site. In holding the special employer liable, it is significant to note that when applying each of the four prongs of the borrowed servant test, most notably the "primary benefit" test, the Huckstorf court properly focused only on the specific act giving rise to the injury itself, and not on the entire three months the crane operator worked for the general contractor. Under the Huckstorf analysis, in the instant case the trial court should have focused solely on Mrs. Green's operation when answering the "primary benefit" test rather than analyzing Dr. Stanford's entire fellowship program. Focusing on the negligent act itself, the Huckstorf court held that "[i]t was certainly to the benefit of [the general contractor] to have the plywood moved to facilitate its obligation to construct the building." Huckstorf, 41 Wis.2d at 54, 163 N.W.2d 190. Similarly, in the instant case it was certainly to the benefit of CVSA to have Dr. Stanford assist in the preparation of Mrs. Green as well as in the heart surgery itself, and thus facilitate the heart by-pass procedure. Since Huckstorf requires this court to focus only on one specific act (Mrs. Green's heart by-pass operation) when answering each of the four prongs of the borrowed servant test, it would strain legal logical reasoning to now allow the district court to misapply Wisconsin case law by shifting gears and broadening the scope of the analysis to include Dr. Stanford's fellowship program (6 months) only when answering the fourth test, the "primary benefit" test.
 
 
 54
 In a similar case, "Finagrain" Compagnie Com. etc. v. Miller Compressing Co., 349 F.Supp. 288 (E.D.Wis.1972), the plaintiff's ship was damaged due to the negligence of a crane operator. The defendant Miller Compressing, the general contractor, had leased both the crane and the operator from Best Cranes and attempted to avoid liability for the crane operator's negligence by claiming the operator was still an employee of Best Cranes. The court disagreed, holding that Miller Compressing, as the "special employer," was liable for the damages caused by the crane operator's negligence. In applying the Huckstorf decision to the facts before it the court noted that the crane operator reported directly to the loading site "and received all his instructions, down to the most precise detail, from Miller's employees." Finagrain, 349 F.Supp. at 291. In the instant case, Dr. Stanford reported directly to CVSA surgeons and received all of his instructions for the Green operation "down to the most precise detail" from CVSA's medical data and personnel. In Finagrain, while it was true that the operator was paid by the owner of the crane, the court held that the question of whether the special employee is paid by the general employer or the special employer "is never decisive and rarely a significant factor." Similarly, although the Air Force paid Dr. Stanford's salary, that fact is not decisive and is an insignificant factor here. Further, the Finagrain court went on to note that because both employers generally receive some benefit regardless of how minute or small, "benefit is not a sufficiently discriminating test." 349 F.Supp. at 292. Contrary to Finagrain, the majority of this court bases its holding solely upon the slender reed of the primary benefit test, which is not of itself a "sufficiently discriminating test." Rather than relying upon the primary benefit test alone, the Finagrain court held that courts should look to the employer that has the immediate "control" and ask "whether the employee 'acted like' a contractor, coming in for the job and controlling the way he performed it, or whether he was assimilated into the temporary employer's team." 349 F.Supp. at 292. In the instant case, there can be no doubt but that Dr. Stanford participated in the Green operation under the supervision, control and direction of CVSA and was "assimilated into [CVSA's] team" as a temporary employee. Because Dr. Stanford was acting as an employee of CVSA and received his instructions "down to the most precise detail" and CVSA's surgeon in charge, and since CVSA received the "primary benefit" from his assistance in Mrs. Green's operation. I would hold that under the Wisconsin Borrowed Servant Doctrine, CVSA, not the government, is liable for Dr. Stanford's negligence.
 
 
 55
 The majority of this court assumes that the government received a substantial benefit, and in so doing, the majority adopts the district court's misapplication of Wisconsin's Borrowed Servant Doctrine and states that because Dr. Stanford "himself sought the unpaid fellowship at CVSA in order to improve his surgical skills," the benefit must necessarily flow to the Air Force. However, the majority's reasoning is not supported by the record since even if Dr. Stanford did in fact state that he sought the fellowship to improve his surgical skills, it does not follow that the Air Force would necessarily receive a benefit therefrom. Contrary to the majority's assumption, I do not understand how any improvement in Dr. Stanford's skills would be of benefit to the government for Dr. Stanford testified that even before he sought or accepted his fellowship with CVSA, he was planning his retirement and severance from the Air Force within the next year, at the time he would have completed his twenty years of service. This period of time is within months after the completion of the fellowship program. The majority's assumption that the government would receive a benefit from Mrs. Green's operation also ignores the fact that prior to Mrs. Green's operation Dr. Stanford had spent more than four months learning heart by-pass procedures under the direction of CVSA's surgeons, and had assisted in numerous other heart by-pass operations prior to Mrs. Green's surgery, and that during these previous operations Dr. Stanford had been instructed and supervised by CVSA's surgeons. At the time of the Green operation, any improvement in Dr. Stanford's skills had reached the point of no return and the potential minute benefit, if any, which would flow to the government from this particular surgical procedure had Dr. Stanford intended to remain in the Air Force was almost nonexistent when compared to the "primary" benefit (i.e., the significant medical fees) which flowed solely to CVSA from Dr. Stanford's assistance as a borrowed servant.
 
 
 56
 From the above analysis it is clear the district court and the majority of this panel have misapplied Wisconsin's law, and it is unquestionable that under the Federal Tort Claims Act, when determining whether the government is liable for the alleged negligence (malpractice) of one of its employees, it is unquestioned that federal courts are bound to apply "the law of the [state] where the act or omission occurred." 28 U.S.C. Sec. 1346(b). See also Dornan v. United States, 460 F.2d 425 (9th Cir.1972) ("Whether or not a particular act of negligence occurs within the scope of an employee's federal employment depends upon an analysis of the facts under the law of the place [state] where the tort occurred"); Haas v. United States, 492 F.Supp. 755 (D.Mass.1980) (Medical malpractice suit against the government is governed by the law of the state where the injury occurred).
 
 
 57
 While it may be true that the government would receive a slight benefit from Dr. Stanford's improved skills if he had in fact intended to remain in the Air Force (which he did not) and teach and perform other surgery on Air Force personnel (which the record does not substantiate), Wisconsin law mandates that the main focus of our inquiry must be on who received the primary benefit from the particular operation which is the subject matter of this lawsuit, that of Mrs. Green, and not merely on whether the government received some benefit. A logical medical, economic and legal analysis of the facts reveals that the primary benefit from the participation of Dr. Stanford, or any other surgeon, in Mrs. Green's operation flowed directly to CVSA. Indeed, there is absolutely no evidence in the record to support a finding that the government received the primary benefit from Dr. Stanford's assistance during Mrs. Green's surgery. Since Dr. Stanford was performing the duty of the assisting physician during Mrs. Green's operation, CVSA did not have to hire another surgeon to assist in the heart by-pass procedure, including but not limited to Dr. Stanford opening Mrs. Green's chest cavity, cannulating her heart prior to the heart by-pass procedure itself and inspecting the placement of the tubes from the heart/lung machine. Although testimony at trial did not reveal the exact fee paid to an assisting surgeon acting in Dr. Stanford's capacity, CVSA physicians did testify that the fee was "significant." After analyzing the decisions of the trial court and this court's majority, I note that both decisions ignore the fact that CVSA saved thousands of dollars while utilizing the services of Dr. Stanford instead of hiring another surgeon, and further place great weight on the argument that since the Air Force paid Dr. Stanford's salary, the Air Force must have received a benefit from his work with CVSA. This reasoning finds no support in the record and ignores economic reality in that although the government paid Dr. Stanford's salary, he was not operating on Air Force personnel and I fail to see how the government could have received any direct benefit from Dr. Stanford's medical services during that period of time.
 
 
 58
 The trial court developed the novel theory that the Air Force benefited by assigning Dr. Stanford to Milwaukee because the Air Force was able to avoid the potentially embarrassing situation of other doctors at Wilford Hall complaining about Dr. Stanford's questionable surgical skills and inflated mortality rates. However, contrary to the trial court's reasoning, the Air Force could have avoided the conflict at Wilford Hall by simply transferring Dr. Stanford to another Air Force base hospital and assigning him to medical duties outside of the operating room, such as in a first aid, emergency room setting or teaching hospital aides. If the Air Force had done so, it would have achieved the goal of relieving alleged peer pressure at Wilford Hall and the Air Force personnel would also have received the continued benefit of Dr. Stanford's medical skills being applied to Air Force personnel while he was paid his full salary.
 
 
 59
 If the Air Force had simply wished to allow Dr. Stanford to "hide out" as asserted by the trial court, the Air Force could have transferred him to an Air Force base much more distant than Milwaukee, such as one on Wake Island, thousands of miles away across the Pacific, or any one of ten or twelve other Air Force bases on foreign soil where Dr. Stanford could have continued to serve Air Force personnel in a capacity other than as a surgeon while still receiving his salary and thus directly benefit the Air Force. There is nothing in the record, other than the trial court's novel idea, to substantiate the plaintiff's theory that the government received any benefit whatsoever from transferring Dr. Stanford to Milwaukee rather than to the Aleutian Islands. Because the Air Force chose to allow Dr. Stanford to work in Milwaukee with CVSA, I would hold that CVSA reaped the enormous and primary benefit of not having to pay the thousands of dollars in salary to another surgeon, and if we are to correctly apply Wisconsin's Borrowed Servant Doctrine as mandated by Wisconsin's Supreme Court, we must reverse the trial court's ruling that the primary benefit from Dr. Stanford's fellowship program flowed to the government.
 
 II.
 
 60
 In affirming the district court the majority erroneously asserts that "even if it were true that Dr. Stanford was acting both 'in the business of' and 'under the direction of' CVSA, the evidence simply does not support the conclusion that his work--however narrowly defined--was of primary benefit to CVSA." The majority supports this illogical proposition by asserting that a substantial benefit flowed to the government because Dr. Stanford sought the fellowship with CVSA "in order to improve his surgical skills," and that "it is highly unlikely that the Air Force would have agreed to this arrangement had it not felt it would benefit from it." Because "Dr. Stanford's fellowship suited the government's needs," of allowing Dr. Stanford to "hide out" and "was intended to benefit the government and Dr. Stanford more than CVSA," the majority contends that both the short term and long term advantages of the fellowship flowed to the government. However, the majority's assumption is sheer speculation, not based on the record, and in adopting this analysis the majority implicitly applies a legal theory which I have previously pointed out was expressly rejected by the Wisconsin Supreme Court less than two years ago. In DePratt v. Sergio, 102 Wis.2d 141, 306 N.W.2d 62 (1981), the Wisconsin Supreme Court declined the opportunity to adopt a "dual liability approach" as an alternative to the borrowed servant rule. The "dual liability approach" would have allowed a plaintiff who is injured by a borrowed servant to recover from both the general employer as well as the special employer. In analyzing and rejecting the dual liability approach, the Wisconsin Supreme Court stated:
 
 
 61
 "Under the dual liability approach, which the plaintiff urges us to adopt, both the borrowing employer and the loaning employer may be held liable in tort to a third party who sustains injuries caused by the negligence of the loaned employee when the loaning employer retains broad control over the loaned employee (such as the right to discharge the employee) and the borrowing employer has control over the details of the loaned employee's work.
 
 
 62
 * * *
 
 
 63
 * * *
 
 
 64
 Under the entrepreneur or enterprise theory of liability both employers should be responsible to the injured party because both exercise a degree of control, both profit from the employee's conduct, and both are capable of planning for and transferring the losses incurred.
 
 
 65
 * * *
 
 
 66
 * * *
 
 
 67
 We conclude, however, that the dual liability approach, although having some merit, does not offer a simple and easily applicable alternative to the borrowed servant rule, and we decline to substitute it for the present rule."
 
 
 68
 Id. at 144-46, 306 N.W.2d 62.
 
 
 69
 As set forth in DePratt, Dr. Stanford, the special employee, was under the exclusive control of CVSA for the purposes of the Green operation while under only the broad control of the United States Air Force at that time. It is clear that under the doctrine of respondeat superior CVSA was liable to the plaintiff for the malpractice of any of its employees proven to be negligent. Indeed, CVSA entered into a settlement with the plaintiff and in exchange for a sum certain ($574,999.00) the plaintiff agreed to release CVSA from all liability for the negligence of its employees during Mrs. Green's operation. The plaintiff did, however, expressly reserve the right to assert liability against both Dr. William Stanford, individually, and also against the United States Government. Thereafter, the plaintiff sued Dr. Stanford as well as the United States Government, alleging that the government was Dr. Stanford's employer and therefore it should be held responsible for Dr. Stanford's negligence. The plaintiff ignored the fact that since Dr. Stanford was a "special employee" of the special employer (CVSA), any negligence attributed to him must be imputed directly to CVSA and not the government and thus Dr. Stanford's negligence should properly have been included in the settlement CVSA made with the plaintiff. As CVSA has already compensated the plaintiff for the negligence of its employees, by also holding the government separately liable for Dr. Stanford's actions the trial court and the majority opinion of this court implicitly adopt the "dual liability" theory previously rejected by the Wisconsin Supreme Court and allow the plaintiff to recover from both the special employer (CVSA) and the general employer (the government) for a "borrowed servant's" negligence.
 
 
 70
 The plaintiff argued and the trial court agreed that the government could not escape liability under Wisconsin's Borrowed Servant Doctrine, because in its motion to dismiss Dr. Stanford, the government conceded that Dr. Stanford was acting "within the scope of his duties" as a military physician. I disagree and join with the majority's holding that "Wisconsin law appears to support the government's argument that nothing precludes it from claiming Dr. Stanford was acting within the scope of his general employment at the same time he was the Borrowed Servant of a Special Employer." The plaintiff misconstrued the government's limited admission that Dr. Stanford was acting within the scope of his duties as a military physician as this admission only goes so far as to invoke "the state law of respondeat superior with respect to tort claims arising out of the alleged wrongful acts of military personnel." Bissell v. McElligott, 369 F.2d 115, 117 (8th Cir.1966).
 
 
 71
 An example of military personnel "acting in the scope of their duties" and "loaned" to a special employer is clearly demonstrated in the events surrounding the recent air traffic controllers strike. During the PATCO employees' wildcat strike, Army Air Force and Navy Air Force air traffic controllers were assigned by the military to work at civilian airports and were on full active duty while receiving their full military pay from the government. The only monetary benefit these military personnel received from their civilian airport "special employers" was a per diem stipend, and likewise, while Dr. Stanford was in Milwaukee, the only monetary benefit he received from CVSA was a housing allowance. Because these air traffic controllers were ordered by their commanding officers to replace the striking workers, clearly they were acting as military personnel on active duty and were acting "within the scope of their duties." Similarly, Dr. Stanford was on active duty and "within the scope of his duties" when he was assigned to work with CVSA. At the time the military air traffic controllers undertook their assignments in Wisconsin, they became the special employees of their civilian "special employers," as was Dr. Stanford a special employee of CVSA.
 
 
 72
 The plaintiff further contends that since the Medical Malpractice Immunity Act, 10 U.S.C. Sec. 1089, immunizes Dr. Stanford from a suit arising out of Mrs. Green's operation, if the government is able to escape liability by the application of the Borrowed Servant Doctrine, the plaintiff will be left without a remedy. Contrary to the plaintiff's argument, the plaintiff herein was not "without a remedy" at the outset of this lawsuit even though Dr. Stanford has been immunized from suit by the Medical Malpractice Immunity Act and the government also avoids liability under Wisconsin's Borrowed Servant Doctrine. Wisconsin's Borrowed Servant Doctrine simply transfers the liability for Dr. Stanford's negligence to CVSA. Thus, the proper application of Wisconsin's Borrowed Servant Doctrine mandates that Dr. Stanford's negligence cannot be imputed to the government, but rather should have been included in CVSA's settlement with the plaintiff.
 
 
 73
 In dissenting from the holding of the majority of this panel I am aware of the serious nature and extent of the injuries sustained by Mrs. Green as a result of the tragic events which occurred during and after her heart by-pass operation. Moreover, I do not condone the actions of the Air Force and firmly believe that Dr. Stanford's superiors had a moral and ethical obligation to advise CVSA concerning Dr. Stanford's questionable surgical skills as well as his high mortality rate, his difficulties at the Air Force base and the personal problems he encountered with other Air Force medical personnel. I also feel that it was disgraceful for the Air Force to attempt to rid itself of a "hot potato" by unloading its "problem child" on CVSA. However, I hold that it is not the province of this court to cast adrift Wisconsin's law, as eloquently set forth by Wisconsin's Supreme Court as recently as DePratt (1981), and further, in the absence of a constitutional question, federal courts should not attempt to revolutionize state law by ignoring legal reasoning and settled case law merely to reach a result I also would like to reach in equity, that of adequately compensating Mrs. Green. Therefore, in light of the fact that federal courts are bound to apply the law of the state, because Dr. Stanford consented to work for CVSA, was performing CVSA's surgical procedure at the specific time of the inquiry (i.e., Mrs. Green's operation), and as CVSA (through Dr. Mullen) had the duty and obligation to control and supervise each and every detail of the heart by-pass procedure from preparation through post-surgical care, and since CVSA received the primary benefit from Mrs. Green's specific operation, I would reverse the district court and hold that the United States government is not liable for Dr. Stanford's alleged malpractice under Wisconsin's Borrowed Servant Doctrine.
 
 
 
 *
 Senior District Judge Dudley B. Bonsal of the Southern District of New York is sitting by designation
 
 
 [1]
 The court also reduced the judgment against the government by 16% of $195,899, the total amount of past medical expenses at the V.A. Hospital where Mrs. Green was cared for
 
 
 [2]
 The district court stated that "the government's contribution rights against tortfeasors other than Dr. Mullen are preserved." However, this appeal is not concerned with the rights of the United States against others who assisted at the operation. In an order dated September 21, 1981 the district court granted the motion of the third-party defendants for severance of the government's claims against them from the trial of the original action between the Greens and the United States
 
 
 [3]
 As an initial matter, the plaintiffs contend that application of the borrowed servant rule here would undermine the purpose of the Malpractice Act. According to the plaintiffs, if the borrowed servant rule were applied Dr. Stanford would be exposed to liability instead of immunized from it, as the Act contemplates. But application of the borrowed servant rule will not subject Dr. Stanford to potential liability. Pursuant to the Malpractice Act, he was properly dismissed as a defendant in the case. Whether or not the borrowed servant rule ought to be applied is a question that must be answered by reference to "the law of the place where the act or omission occurred." 28 U.S.C. Sec. 1346(b). If Wisconsin law dictates that some party other than the United States should be held vicariously liable for Dr. Stanford's negligence, the result would in no way contravene the purpose of the Malpractice Act. Cf. Baker v. Barber, 673 F.2d 147 (6th Cir.1982) (immunity afforded by Malpractice Act bars suit against military physicians even though Federal Employee Compensation Act also barred plaintiffs from recovering under FTCA)
 
 
 [4]
 While it allowed the issue to be tried, the district court thought the government should be barred from pleading the borrowed servant rule, on the ground that the Malpractice Act and the FTCA must be read in pari materia. In the district court's reasoning, if the phrase "acting within the scope of his ... employment" has the same meaning in each statute, the government cannot escape liability under the FTCA for Dr. Stanford's negligence once it has conceded that he was acting in the line of duty. However, Wisconsin law appears to support the government's argument that nothing precludes it from claiming Dr. Stanford was acting within the scope of his general employment at the same time that he was the borrowed servant of a special employer. See Meka v. Falk Corp., 102 Wis.2d 148, 157, 306 N.W.2d 65, 71 (1981)
 
 
 [5]
 These include:
 (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
 (b) whether or not the one employed is engaged in a distinct occupation or business;
 (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
 (d) the skill required in the particular occupation;
 (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
 (f) the length of time for which the person is employed;
 (g) the method of payment whether by the time or by the job;
 (h) whether or not the work is a part of the regular business of the employer;
 (i) whether or not the parties believe they are creating the relation of master and servant; and
 (j) whether the principal is or is not in business.
 
 
 [6]
 Dr. Stanford's status as a professional with special skills underscores the difference between this case and the more typical one involving the borrowed servant rule. Typically, the employee is an hourly wage-earner whose work must be closely supervised. See, e.g., Meka v. Falk Corp., supra, ("unskilled laborer"); Freeman v. Krause Milling Co., 43 Wis.2d 392, 168 N.W.2d 599 (1969) (janitorial worker); Huckstorf v. Schneider Enterprises, supra (crane operator). In that situation, it naturally makes sense to impute liability to the special employer if the employee was following his directions at the time of the accident. The present case falls somewhere in between the typical case and a case like Dornan v. United States, supra, where the court held that the employee "was cooperating with, rather than becoming subservient to, the 'borrowing' employer." 460 F.2d at 428
 
 
 [7]
 Plaintiffs' argument that the government is precluded from raising the defense of the borrowed servant rule on grounds of both waiver and estoppel is meritless. As to the claim of waiver, the government admits that its initial answer made no mention of the borrowed servant rule. However, the district court permitted the government to file an amended answer asserting the borrowed servant rule as an affirmative defense, with no objection from the plaintiffs. As to the estoppel claim, it is true that the defense was first raised after the running of the statute of limitations that applies to tort actions under Wisconsin law, so that a suit against Dr. Stanford individually could no longer have been brought. However, Dr. Stanford was in any case protected from liability by the Malpractice Act. Therefore, even if the government intentionally waited until the limitations period had expired before raising the defense, plaintiffs cannot argue that they relied to their detriment on the government's conduct
 
 
 [8]
 Mrs. Green, being a veteran, was entitled to medical treatment at the V.A. Hospital. The district court did not include in its award the past medical expenses at the V.A. Hospital as to do so would have resulted in double recovery
 
 
 [9]
 The government appears to have miscalculated this figure. The excess recovery about which the government complains is properly determined by subtracting from the amount of the settlement ($575,000) the two amounts by which the district court actually reduced the judgment against the government (16% of $2,177,352 and 16% of $195,899). This results in a figure of $195,280